Darrell Wayne DURHAM, Appellant,

v.

The STATE of Texas.

No. 12–95–00129–CR.

Court of Appeals of Texas,
Tyler.

Feb. 27, 1997.

Discretionary Review Refused
Aug. 13, 1997.

Ebb B. Mobley, Longview, for appellant.

C. Patrick Savage, William M. Jennings, Longview, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

RAMEY, Chief Justice.

Appellant was indicted for involuntary manslaughter after the vehicle he was operating struck and killed a man while Appellant was allegedly under the influence of marijuana. A jury found him guilty of manslaughter with a deadly weapon and assessed his punishment at eight years in prison and a fine of $10,000. We will **reform** the judgment to correct its reference to the number of jurors reaching the verdict and otherwise **affirm** the trial court's judgment.

■ In his first of four points of error, Appellant alleges that the trial court erred in admitting the results of a chemical test under the business records exception to the hearsay rule without authentication by the chemist who performed the test. Appellant claims that the tests performed by the Bexar County Forensic Science Center ("BCFSC") to determine the presence of chemical components of marijuana in his blood were inadmissible without authenticating testimony by the person who actually performed the tests. The trial court admitted State's Exhibit # 8, a copy of the results of the blood test, under the business record exception to the hearsay rule. *See* TEX.R.CRIM. EVID. 803(6). Appellant admits that the State followed the proper steps for authenticating the test results as a business record by having the chief toxicologist at BCFSC testify in his capacity as custodian of the records, but he complains that Rule 803(8) of the Texas Rules of Criminal Evidence governs the admission of such evidence rather that Rule 803(6).

In *Cole v. State*, 839 S.W.2d 798 (Tex.Cr. App.1990), the Texas Court of Criminal Appeals examined the relationship between the business records exception and Rule 803(8), the hearsay exception for "Public Records and Reports." Rule 803(8) provides an exception to the hearsay rule for

[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to

report, *excluding, however, matters observed by police officers and other law enforcement personnel.* . . .

TEX.R.CRIM. EVID. 803(8) (emphasis added). In *Cole*, the trial court admitted a report prepared by a chemist working for the Department of Public Safety ("DPS") laboratory who did not testify at trial, and the Court of Criminal Appeals held that the chemist and the DPS lab were law enforcement personnel. The contents of the report, therefore, constituted matters observed by law enforcement personnel and did not qualify as an exception to hearsay under Rule 803(8)(B). *Cole*, 839 S.W.2d at 806. The court also held that because the evidence was barred by Rule 803(8)(B), it could not be admitted into evidence on the basis of Rule 803(6). *Id.* On rehearing, the court further observed that the DPS lab "is a uniquely litigious and prosecution-oriented environment" and set out the circumstances indicating that the lab might be "prosecution-oriented," including the fact that the report bore a letterhead with the State seal and that the prosecutor was carbon copied on the report by the lab. *Id.* at 809–810. Quoting their original opinion, the court explained that "'perhaps most importantly, the reports were not prepared for purposes independent of specific litigation, nor were they ministerial, objective observations of an unambiguous factual nature.'" *Id.* at 810.

Subsequently, confronted with the same issue, the court of appeals in *Caw v. State*, 851 S.W.2d 322 (Tex.App.—El Paso), *pet. ref'd*, 864 S.W.2d 546 (Tex.Cr.App.1993), distinguished the situation before it from that in *Cole*. In *Caw*, the court held that chemists working for the Drug Analysis Division of the Dallas County Forensic Laboratory ("DCFL") were not law enforcement personnel and that the report prepared by one chemist and sponsored at trial by her supervisor was admissible under either Rule 803(8) or 803(6). In considering the *Cole* standard, the court noted that the DCFL is a county agency, that eighty to eighty-five percent of its testing is done for law enforcement agencies, and that lab personnel know that criminal prosecution is likely when a test reveals the presence of a prohibited substance; nev-

ertheless, the court admitted the report, explaining its reasoning thusly:

> [DCFL] functions independently from any law enforcement body, and its services are available to any person, public or private, corporate or individual, who wishes to pay the lab fees. The chemical analyses are routine procedures, done for whomever requests them. This status, we hold, distinguishes the lab here from the DPS lab in *Cole.* The [DCFL] is not the inherently adversarial, litigious and prosecution-oriented environment characterized in *Cole.* It is an autonomous agency, and we hold that the results of its testing need not be viewed with the same caution reserved for law enforcement agencies.

*Caw v. State,* 851 S.W.2d at 324.

In the trial of the instant case, the State presented the testimony of a toxicologist, Dr. Garriott ("Garriott"), who was the director of BCFSC and the supervisor of the chemist who conducted the blood test in question. The BCFSC is an agency of the county (Bexar), under the direction of the county commissioner's court, but according to Garriott, it is not a law enforcement agency. He testified that the blood sample from Appellant was sent to BCFSC by the DPS with the request that it be tested for the presence of cannabinoids, the chemical ingredients of marijuana. He stated that he had personally designed the tests used by BCFSC and that his was only one of two labs in Texas capable of performing the type of testing requested in this case. The DPS' own lab did not possess the technology to perform tests for cannabinoids and typically referred those matters to the BCFSC. The BCFSC was not under any contract to perform regular testing for the DPS although it did have such an arrangement with the San Antonio Police Department. Garriot explained that the scope of his agency's testing is broad, including testing for both public and private clients, and each client pays a fee for the lab's services. In addition to law enforcement agencies, the BCFSC performs test for hospitals, physicians, pathologists, and even public school systems. Their work is therefore not limited to criminal investigations, but even in criminal matters, Garriott stated that he has testified as an expert for defendants as well as for the prosecution.

In a more recent opinion, the Texas Court of Criminal Appeals has applied the two-pronged standard established in *Cole* to hold that reports of a medical examiner were admissible because the medical examiners are not "law enforcement personnel." *See Garcia v. State,* 868 S.W.2d 337 (Tex.Cr.App. 1993). The Court of Criminal Appeals reiterated the two parts of the test: (1) whether the reports consist of "objective, routine, scientific determinations of an unambiguous factual nature prepared by officials with no inherent motivation to distort the results on the issue," and (2) whether they were prepared in an adversarial context or for purposes independent of specific litigation. *Garcia v. State,* 868 S.W.2d at 341–342.

In the case at bar, Garriott admitted that the conclusions drawn from the tests performed by his lab had a subjective component; however, the court in *Garcia* observed that some degree of subjectivity is acceptable and does not fail the first prong of the *Cole* test. Requiring the interpretation of the results of scientific testing to be a purely objective process would have the effect of making "most, if not all, scientific reports inadmissible." *Id.* at 341. Here, Garriott testified at length regarding the type of tests performed on Appellant's blood sample and the results of those tests. There is no evidence to suggest that the chemists working for the BCFSC had any "inherent motivation to distort the results." *Id.* As for the second prong of the *Cole* test, Appellant argues that one indicator of an adversarial context may be found in the letterhead appearing on the reports themselves: "Bexar County Forensic Science Center, Criminal Investigation Laboratory." Of course, any test for the presence of marijuana in the bloodstream will naturally be conducted with a view to a criminal investigation should those test results be positive. Still, as with the lab in question in *Caw,* the BCFSC performs tests in criminal and non-criminal matters, and Garriott stated that he has testified for defendants on occasion.

In a recent opinion in which the results of tests performed by the BCFSC were in is-

sue, the Court of Criminal Appeals declined an opportunity to comment on whether the chemists performing tests for the BCFSC were law enforcement personnel. In *Aguilar v. State*, 887 S.W.2d 27 (Tex.Cr.App.1994), wherein a question arose regarding the admissibility of tests performed by BCFSC, the court disposed of the case on different grounds but noted the following in a footnote:

> We also granted the State's petition for discretionary review in this case to determine whether the chemists who performed the laboratory analyses were "law enforcement personnel" within the meaning of this Rule. But the record really contains too little information about BCFSC to answer this question. We do not know, for example, whether it is a public or a private organization, whether it performs laboratory analyses for individuals or groups other than law enforcement agencies, and whether it charges a fee for its services. *Compare Caw v. State*, 851 S.W.2d 322 (Tex. App.—El Paso 1993), *PDR. ref'd*, 864 S.W.2d 546. Although we recently held in *Garcia v. State*, 868 S.W.2d 337 (Tex.Cr. App.1993) that medical examiners are not law enforcement officers for purposes of Rule 803(8)(B), it appears that only part of BCFSC's work is actually done for the Medical Examiner's Office. The rest evidently involves chemical analysis of unknown material, performed at the request of law enforcement officers to determine whether it contains any legally controlled substances. Because it was admittedly in this latter capacity that Castorena [the sponsoring chemist] and his subordinates examined the substances here in question, we do not regard *Garcia* to be controlling in the present context. Nevertheless, because the record does not contain sufficient evidence to determine BCFSC's law enforcement status, the Court of Appeals should have decided which party bore the burden of proof on this question before holding Castorena's testimony to be excludable under *Cole*. TEX.R.CRIM. EVID. 104(a).

*Aguilar*, 887 S.W.2d at 29.

The record in the instant case contains the kind of evidence, set out above, that the court of criminal appeals found lacking in *Aguilar* and that the court of appeals found convincing in *Caw*. The BCFSC is more akin to the Dallas County Forensic Laboratory considered in *Caw* than to the DPS lab at issue in *Cole*. We note that in *Caw*, the Court of Criminal Appeals refused the appellant's petition for discretionary review, with one of the justices writing a dissenting opinion. This suggests that the majority of justices of the higher court agree that there is a clear distinction on this issue between a county forensics lab and the DPS lab. There is no evidence to suggest that the BCFSC is an "inherently adversarial, litigious and prosecution-oriented" entity. *Caw v. State*, 851 S.W.2d at 324. We are persuaded to hold that the chemists and toxicologists of the BCFSC were not "law enforcement personnel" in this case and that State's Exhibit # 8 was admissible without the testimony of the conducting chemist under Rule 803(6) or Rule 803(8). Appellant's first point of error is overruled.

■ In his second assignment of error, Appellant alleges that the trial court erred in allowing Garriott to testify regarding the degree of impairment of Appellant's abilities at the time of the accident. The trial court allowed Garriott not only to testify regarding the presence of cannabinoids in the blood sample but also to offer his opinion concerning whether and to what extent Appellant was intoxicated by marijuana at the time of the accident, based on the levels of the chemical components found in the blood sample taken at least two hours after the accident occurred. Appellant complains that Garriott's voir dire testimony did not establish whether the evidence of the degree of impairment was reliable and accepted by the scientific community. During the court's voir dire examination of Garriott, Appellant's counsel objected twice:

> (1) I am objecting to what I perceive and what I know Dr. Garriott's testimony is going to be to the jury regarding [Appellant], in his opinion, having ingested this substance in his system within a particular time period . . . .; and
>
> (2) I am objecting to Dr. Garriott testifying before the jury regarding any particu-

lar degree of impairment or intoxication of the individual because I do not believe that degree of impairment and levels of THC in your blood have been scientifically correlated. . . .

Appellant did not object to Garriott's qualifications as an expert in the fields of blood testing and toxicology, and even stated to the court that he was "not objecting to the fact that the gas chromatography or the mass spectrometry [were] not accepted within the scientific community"; his objection was directed only to whether Garriott could reach a scientifically acceptable conclusion regarding the time and degree of impairment from marijuana ingestion based upon the levels of cannabinoids found in the blood sample. The trial court overruled his objections.

■ The Court of Criminal Appeals set out the standard for the admission of novel scientific evidence in *Kelly v. State*, 824 S.W.2d 568 (Tex.Cr.App.1992), holding that the trial judge must determine whether the proffered expert testimony is reliable and relevant and then "decide whether the probative value of the testimony is outweighed by one or more of the factors identified in Rule 403," such as the danger of unfair prejudice or confusion of the issues. *Id.* at 572. The reliability of such evidence must be adjudged according to three basic criteria, all of which must be proven to the trial court, outside the presence of the jury, with clear and convincing evidence: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Id.* at 573.

During a voir dire examination, Garriott offered a lengthy review of his credentials as a toxicologist specializing in the detection of and effects of marijuana in the bloodstream; in fact, he wrote his doctoral thesis on the effects of the chemical components of marijuana. Furthermore, he explained that he had designed the tests used in this case himself and could say with certainty that the testing process had been followed precisely. During the voir dire examination, the court asked Garriott whether it was possible to "correlate, either by quantity or quality, the extent of cannabinoids evidenced in the blood

on the one hand and the degree of intoxication or impairment on the other hand." Garriott explained that though the correlation is not as direct and well established in the case of marijuana as it is with alcohol, a correlation does exist. According to Garriott, "[t]he findings would have to be interpreted on the basis of the short half-life of marijuana, the presence of cannabinoids that we did find and the time factor between the time the sample was taken and the accident." He went on to explain that it is "fairly well documented in scientific circles" that "reasonable judgments and estimations" may be made based on the half-life of the cannabinoids concerning the level of intoxication and effects of intoxication at a particular time.

Garriott explained that by utilizing his knowledge of the half-life of the cannabinoids and their potency in the bloodstream, he was able to calculate the probable degree of impairment from the marijuana at the time of the accident and the probable effects of the marijuana on Appellant's driving abilities. The trial court had the discretion to determine whether Garriott was qualified to give an expert opinion on these issues, and its decision in overruling Appellant's objections to Garriott's testimony will not be disturbed absent an abuse of that discretion. *Kelly*, 824 S.W.2d at 574; *Burnett v. State*, 842 S.W.2d 296, 299 (Tex.App.—Fort Worth 1992, pet. ref'd). If "the trial court's decision was 'within the zone of reasonable disagreement' given the evidence presented at the suppression hearing and given the requirements of Rule 702," there was no abuse of discretion. *Kelly*, 824 S.W.2d at 574. The trial court heard testimony from Garriott indicating that the underlying scientific theory was accepted in the scientific community, that the technique applying the theory (Garriott's calculations based on his knowledge and the test results) was valid, and that the technique was properly applied in this instance. We hold that the trial court did not abuse its discretion in finding that Garriott's testimony established the three criteria for reliability set out in *Kelly*. Nor did the trial court abuse its discretion in ruling that the probative value of the evidence was not outweighed by any of the factors mentioned in Texas Rule of Criminal Evidence 403, includ-

ing the danger of unfair prejudice or confusion of the issues. We overrule Appellant's second point of error.

In his third point of error, Appellant contends that the trial court erred in accepting an improper verdict concerning the use of a deadly weapon in the commission of the offense. On the special interrogatory page of the jury charge, the jury foreman signed both the negative and affirmative responses on the deadly weapon issue. Appellant complains that the court erred in accepting it in that condition. The State points out, however, that the mistake was discussed in open court and that the jury foreman acknowledged his mistaken signature in the negative column and corrected his mistake while the verdict was still informal, as the following exchange illustrates:

> The Court: Do I understand from your verdict on the special interrogatory that the decision of the jury is not unanimous?
>
> Foreman: No. It is.
>
> The Court: It is unanimous?
>
> Foreman: Uh-huh.
>
> The Court: All right. I am asking the bailiff to hand this back to you and ask you if it correctly reflects your verdict.
>
> Foreman: Oh, no. It's a mistake.
>
> The Court: You need to make a correction?
>
> Foreman: Yes.
>
> The Court: I am going to hand you a pen and let you make the correction. Is the mistake your missing signature?
>
> Foreman: Yes.

The court went on to read the jury's verdict in open court, including the special interrogatory in which the jury found Appellant guilty of using a deadly weapon. The court then mentioned the mistake made by the jury foreman on the signature lines:

> The Court: ... signed by [the foreman]. And there are ten lines underneath the signature of the foreman's signature [sic]. The erroneous signature appears on the other option, but the

foreman of the jury has explained that was an error.

The court then asked the jurors if the verdict as read was correct, and the members of the jury agreed that it was. The court then asked if there were any objections to the jury's verdict and offered to allow anyone to examine it. Appellant's counsel stated that he had no objection.

The trial judge's discussions in open court clearly reveal the problem complained of on appeal. The trial judge's initial query of the foreman did not suggest that a mistake had been made; instead, he began the process by asking the foreman only whether the verdict was not unanimous and did so because the foreman's signature appeared below the negative response while the ten other jurors' signatures appeared beneath the affirmative. As the colloquy printed above reveals, the judge asked the bailiff to give the verdict sheet to the foreman for his review, and the foreman himself stated that he had made a mistake. The trial court did not "suggest the appropriate correction" as Appellant claims.

All present in the courtroom were apprised of the mistake and the correction, and Appellant's counsel stated that he had no objection. The court's discussion of the verdict form with the members of the jury reveals that the mistake and its correction were made known in open court. Appellant could have objected at that time and could have requested that the jury be polled in accordance with Article 37.05 of the Texas Code of Criminal Procedure. We hold that the trial court did not err in calling attention to the mistake on the special interrogatory on the deadly weapon issue and allowing it to be corrected. *See Neal v. State,* 689 S.W.2d 420, 428 (Tex.Cr. App.1984), *cert. denied.,* 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985). Appellant's third point of error is overruled.

In his fourth and final point of error, Appellant alleges that the trial court erred in its written judgment because the judgment states that the verdict was reached by the foreman and "eleven others" when the actual signed verdict forms show the foreman's signature and those of ten other jurors. Both Appellant and the State maintain that this court should reform the judgment to reflect

the fact that the jury was composed of only eleven jurors and that the verdicts were signed by the foreman and ten others. Therefore, the judgment of the trial court will be reformed to show that there were ten jurors in addition to the foreman.

The judgment of the trial court is **reformed** to replace the phrase "and eleven others" with the phrase "and ten others," and it is **affirmed** as **reformed.**