**Affirmed and Majority and Concurring Opinions filed March 28, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00440-CR

---

**JACKIE LEE HALEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 25th District Court**
**Colorado County, Texas**
**Trial Court Cause No. 10-118-CR**

---

## M A J O R I T Y   O P I N I O N

In six issues, appellant challenges his conviction on three counts of manslaughter, arguing that the trial court erred by implicitly referring to appellant's felony conviction during voir dire, admitting the State's expert testimony, submitting an improper jury charge, and failing to quash the indictment. We affirm.

# I. BACKGROUND

On February 17, 2010, appellant was driving a semi-truck towing an empty livestock trailer, enroute to retrieve cattle and then drive all night. Appellant testified that, prior to beginning his trip, he consumed a substance in order to stay awake. It is undisputed that the substance contained methamphetamine.

At around 7:00 p.m., appellant was driving on Interstate 10 in Colorado County. The relevant portion of Interstate 10 is a four-lane highway, with two lanes of east-bound traffic and two lanes of west-bound traffic, separated by a median with a gully and safety fence comprised of metal posts and cables. At that time, it was dry and clear outside and already, or about to become, dark.

Witnesses who were driving in vehicles behind appellant provided the following testimony. Appellant was driving in the right-hand lane of the east-bound highway; he was not driving erratically or speeding. Suddenly, appellant veered left, across the left-hand lane of the east-bound highway, through the safety fence in the median, and into oncoming traffic on the west-bound highway. Immediately after entering the west-bound highway, appellant's truck struck two oncoming vehicles, resulting in an explosion of fire. Appellant's truck and trailer "jackknifed" and eventually came to a stop on top of one of the other vehicles. During the accident, appellant never operated the truck's turn signal or brakes or made any corrective maneuvers. There was no obstruction in the highway that may have caused appellant to veer left. The witnesses exited their vehicles and approached the accident scene. They saw appellant attempting to escape from his truck and were able to pull him to safety. The occupants of the vehicles appellant struck—two teenagers and a sixty-four year old man—died as result of the accident.

An EMT who treated appellant at the scene testified as follows. Appellant sustained a leg bruise and a laceration on his wrist, but no serious injuries. His demeanor was "very calm," and he was able to answer basic questions. He was not in shock. Based on the EMT's experience, appellant's demeanor was "alarmingly calm"—very different from the usual person involved in a motor vehicle accident. Appellant said, "I hit another vehicle. I hope everybody is okay. I hope nobody is hurt."

State Trooper Stephen Pierce testified as follows. By the time Trooper Pierce arrived at the scene, the vehicles involved in the accident were so badly burned they were unrecognizable. After investigating the scene, Trooper Pierce proceeded to the hospital to question appellant. During questioning, appellant was cooperative and coherent, but his demeanor was "very flat" and he was not talkative. Appellant displayed no physical reaction when Trooper Pierce stated that three individuals had died as a result of the accident. Based on Trooper Pierce's experience, appellant's reaction was atypical. Appellant agreed to provide a blood sample so that officers could determine whether "alcohol or drugs [were] a contributing factor to this crash."

The nurse who treated appellant at the hospital on the night of the accident testified appellant was withdrawn and anxious but not in shock. Appellant told the nurse numerous times that "he thinks he might have passed out and that's what caused the wreck." Appellant's medical records from the hospital reflect that he informed the treating physician he had been suffering from a cough. The physician noted that appellant suffered a "syncopal episode," which means "you lose consciousness." Additionally, the medical records reflect that appellant had been taking Lisinopril, a blood-pressure medication that may cause coughing as a side

effect, particularly with smokers such as appellant. Appellant did not inform medical personnel that he had consumed a stimulant.

The State's toxicologist, Megan Barton, tested appellant's blood sample and testified that the blood contained methamphetamine at 0.80 milligrams per liter ("mpl"). According to Barton, this amount of methamphetamine was much higher than the therapeutic amount of 0.02 to 0.05 mpl and any amount over 0.20 mpl is considered abusive. Barton also explained that the effects of methamphetamine consumption have two phases: (1) a stimulant phase, during which the user is stimulated, euphoric, and excited, and (2) a withdrawal phase, during which the user is "drowsy, fatigued, [and] light sensitive."

Appellant was indicted for three separate counts of manslaughter. During trial, appellant testified as follows. On other occasions, appellant had used methamphetamine to stay awake and alert for long periods of time. Appellant had been convicted of, and incarcerated for, a prior methamphetamine-related offense. On the day of the accident, he consumed a substance in order to stay awake but did not know the substance contained methamphetamine; however, during cross-examination, appellant admitted he knew he "was on methamphetamine." Regardless, appellant insisted he did not veer into oncoming traffic due to his consumption of methamphetamine. Instead, he suffered a severe coughing episode during which he saw "stars" and fainted.

The State presented Barry Logan, Ph.D. as an expert witness. Dr. Logan described his studies and research regarding the effects of methamphetamine and motor vehicle accidents. Dr. Logan opined that the concentration of methamphetamine in appellant's blood meant he was affected by the drug at the time of the accident. Dr. Logan explained that the effects of methamphetamine consumption vary by person and declined to opine regarding the effects appellant

4

was experiencing at the time of the accident. However, Dr. Logan testified that a person under the influence of methamphetamine who is lethargic is more likely to be in the withdrawal phase of the drug.

Appellant presented Gary Deegear, M.D. as an expert witness. Dr. Deegear opined that appellant veered off the road because he suffered "tussive syncope," which essentially means fainting due to coughing. Dr. Deegear also testified that there are no medical findings correlating methamphetamine consumption with coughing.

The jury found appellant guilty on all three counts of manslaughter, and found that he used or exhibited a deadly weapon during the commission of the offenses. During the punishment phase, appellant pleaded true to a prior felony conviction, and the jury assessed punishment at twenty years' confinement for each offense, to run concurrently.

### III. VOIR DIRE

In his first issue, appellant contends the trial court erred by improperly informing the venire that appellant had applied for probation. During the initial portion of voir dire when the trial court was informing the panel about the law, the following occurred:

> [Trial Court:] [I]f the Defendant is found guilty, the second stage or punishment stage of the trial is held. . . .
>
> *Our law further provides that if a defendant has not before been convicted of a felony in this or any other state, he may file an application for a probated sentence, commonly referred to as "community supervision," probation, a probated sentence. The application must be filed before the commencement of the trial. It is required by law. The Defendant in this case has filed such an application, and in doing so, he has exercised a legal right, and you cannot consider the fact that he has exercised that right as any evidence of his guilt.*

5

Also, to be a fair juror, you must be able to consider [in] the event you have found the Defendant guilty beyond a reasonable doubt the entire range of punishment as authorized by law; thus, if under no circumstances you could consider the minimum punishment or the maximum punishment *or the granting of probation*, if eligible, you would not be a fair juror.

. . .

[Appellant's counsel:]  May I approach, Your Honor?

[Trial Court]: Yes, sir.

(At the bench, on the record.)

[Appellant's counsel:]  In this incident the defendant has not filed an application for probation.

[Trial Court]: You haven't?

[Appellant's counsel:]  No, sir, he has a prior felony conviction.  He's not eligible.  And for the record, we object to the admonition of the Jury in that regard insofar as it basically has told them he's --

[Trial Court]: Okay. You didn't enhance the indictment?

[Prosecutor:] Yes, I did.

[Appellant's counsel:]  Yes, sir.

[Trial Court]: You did?

[Appellant's counsel:]  It's five to life.

[Trial Court]: Oh, crap.

[Prosecutor:]  It's a pending case is the new indictment after that.

[Trial Court]: Okay. I thought I checked that. I guess I checked it wrong. Well, let me go back.

[Prosecutor:] I would like it corrected.

[Trial Court]: Yes. Okay.  What I'll do is I'm not going to talk about the probation, I'll just talk about the usual -- in certain circumstances the range of punishment can be.

. . .

(Open court, on the record.)

[Trial Court]: . . . .  Now, back to the question. At this time, as you sit there not knowing anything about the case, not knowing anything about the

Defendant, can you imagine a situation in which you would assess the minimum punishment, or the maximum punishment, *or the granting of probation if eligible*? The attorneys will probably talk to you about this more, but right now, is there anyone who cannot imagine a situation where they would assess the minimum or the maximum *or the granting of probation, if eligible*? All right. As you sit there now, y'all can imagine. Again, the attorneys will talk to you more about -- about that.

. . .

[Appellant's counsel:] May I approach, Your Honor?

[Trial Court]: Yes, sir.

(At the bench, on the record.)

[Appellant's counsel:] Since the Defendant has not filed an application for probation, and the Jury has been instructed to be eligible, he has to be free of prior felony convictions. In essence, the panel has been informed that the defendant has a prior felony conviction, and we would object to the panel, as a whole, and request they be excused and another panel brought in.

[Prosecutor:] Your Honor, my belief is that you just mentioned, you didn't speak specifically to this case but in general, and --

[Trial Court]: Yeah, it's just the law provides --

[Prosecutor:] -- in voir dire on probation in the future, and then we'll just talk about the range of punishment from 2 to 99 or life. If -- certainly, if they could consider probation, they could consider two years. So I don't believe any errors demand that and would be harmless at best.

[Trial Court]: Okay. I'm just going to tell them he's not filed an application.

. . .

[Appellant's counsel:] I think it might even compound it, Judge, by drawing more attention to it. I don't know how it can be cured at this point. I don't think that would be an appropriate cure. I think it would compound the problem, and we would object to the --

[Trial Court]: Well, then I won't do anything, because then I won't compound it. Thank you.

[Appellant's counsel:] With that objection on the record, we'll announce ready.

(emphasis added).

7

Appellant contends the trial court effectively informed the panel that he had a prior felony conviction. We disagree. Although the trial court erroneously stated that appellant had applied for probation, the venire was never told appellant actually did not apply for probation. After appellant brought the mistake to the trial court's attention, the trial court nevertheless again asked the venire: "[I]s there anyone who cannot imagine a situation where they would assess the minimum or the maximum *or the granting of probation*, if eligible?" By continuing to mention probation as a possible punishment, the trial court prevented any implicit suggestion that appellant was ineligible for probation. Additionally, appellant wisely recommended that the trial court *not* inform the venire that no application for probation had been made because doing so may have been construed as a comment regarding his criminal history.

During the guilt-innocence phase, appellant testified that he had a prior methamphetamine conviction. Appellant argues it is impossible to determine whether he would have testified in his own defense had the trial court not erroneously stated that appellant applied for probation. Nonetheless, because the trial court's error did not inform the venire about appellant's felon status, appellant had no need to explain his criminal history to the jury. We overrule appellant's first issue.

## III. EXPERT TESTIMONY

In his second issue, appellant contends the trial court erred by admitting Dr. Barry Logan's testimony over appellant's Rule 702 objection. The crux of appellant's argument is that Dr. Logan's methamphetamine studies and opinion that appellant was under the influence of the drug at the time of the accident are scientifically unreliable.

## A. Standard of Review

Texas Rule of Evidence 702 requires scientific evidence to be reliable and relevant. Tex. R. Evid. 702. In order for an expert's testimony to be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–93 (1993)).[1] The burden of proof is on the proponent of the expert testimony to prove by clear and convincing evidence that the testimony is trustworthy. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The trial court's decision to admit expert testimony is reviewed under an abuse-of-discretion standard. *Id.* at 574. The trial court's decision must be upheld if it was within the zone of reasonable disagreement. *Id.*

Expert testimony evidence is reliable if the proponent shows that (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. *Id.* at 573. Appellant argues specifically that Dr. Logan's testimony was erroneously admitted because (1) Dr. Logan was unable to show that the technique or theory could be tested scientifically, (2) Dr. Logan's theory had not been subjected to peer review, and (3) there was no known error rate for Dr. Logan's theories.

The court in *Kelly* provided some guidance by listing the following seven non-exclusive factors a court may use to determine reliability:

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;
>
> (2) the qualifications of the expert testifying;

---

[1] Appellant does not argue that Dr. Logan's testimony is irrelevant.

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Kelly*, 824 S.W.2d at 573.

## B. Analysis

The trial court conducted a pretrial *Daubert* hearing at which Dr. Logan testified that he has a bachelor's degree in chemistry and a Ph.D. in forensic toxicology, and is a board-certified forensic toxicologist with approximately 25 years of experience. He has been employed since 2008 as the national director of forensic services of NMS Labs in Pennsylvania. He was a state toxicologist in Washington State from 1990 to 2008 and the director of the state crime laboratory system for Washington State from 1999 to 2008. He is the executive director of a nonprofit foundation in Pennsylvania involved in forensic science and toxicology education and training. He directs a program at Indiana University, Center for Studies of Law and Action, training individuals in the effects of alcohol and drugs on driving. He has published about 80 articles in peer-reviewed medical and scientific literature in the area of toxicology. Dr. Logan has testified in court as an expert witness with respect to the subject of methamphetamine and its effects on human performance in at least ten criminal cases and in six civil cases.

Dr. Logan's technique is to review data regarding individuals under the influence of methamphetamine, deaths caused or related to methamphetamine use, clinical signs and symptoms of methamphetamine use, and epidemiological

studies—incidents in which methamphetamine is found in arrested, injured, or fatally injured drivers. He then takes all the information, correlates the relationship between the amounts of methamphetamine in the blood of those persons and the circumstances of the driving, arrest, injury, or death. His studies report signs and symptoms observed in individuals who tested positive for methamphetamine after an accident, concentration of methamphetamine found in their blood, and the relationship between the amount of the drug and the circumstances of the accident. Due to ethical restraints in dosing humans with abusive amounts of methamphetamine, controlled studies of methamphetamine at abusive amounts and its effects on driving are not possible.

Dr. Logan's theory and technique utilized toxicology, pharmacology, clinical studies, and epidemiological studies. Toxicology is the study of the adverse effects of drugs, chemicals, and poisons on biological organisms, and forensic toxicology is the investigation or review involving a person exposed to a drug or chemical that has affected him in a way that has a medical-legal consequence. Dr. Logan testified that epidemiological studies are fairly common in the scientific community. Dr. Logan testified that there have been subsequent publications of studies regarding methamphetamine and its effect on skills related to driving by groups in Sweden and Norway that used similar techniques/methodologies as his and came to the same general conclusions. Dr. Logan's 1996 study utilizing his theory and technique was subjected to peer review and published. At the time of his testimony, Dr. Logan was studying a larger group, involving 1,100 or 1,200 individuals, using the same technique.

Dr. Logan testified that there are probably 25 studies that have covered the effects of stimulant drugs, including methamphetamine, and driving, all of which have reached generally the same conclusion as Dr. Logan. Dr. Logan testified that

11

he was not aware of any study of methamphetamine involvement in traffic crashes which concluded that methamphetamine did not contribute to the crash. He testified that he is not aware of any body of literature that says methamphetamine does not impair driving ability.

Dr. Logan testified that he had not attempted to assess a rate of error to the ultimate issue of whether an individual was impaired in the studies he had completed, nor did he believe anyone else had in their studies. Dr. Logan also admitted that his study and other similar studies were not "controlled" in the traditional sense because there were several unknown variables among subjects, such as health, disease, and nutrition; in those kinds of studies—observational studies—it is not possible to control everything. However, Dr. Logan explained the studies were "controlled to the extent . . . they focused on cases where methamphetamine or amphetamine were the only drugs present." He further explained that the maximum published rate for therapeutic methamphetamine was 0.20 mpl, whereas the average rates of individuals who consumed methamphetamine and were subsequently killed in traffic accidents or arrested for driving violations were around 0.35 mpl (Dr. Logan's study) and 0.54 and 0.35 mpl (other studies).

When questioned by the court, Dr. Logan stated it is difficult to relate a blood concentration to a specific degree of impairment, but at appellant's level of 0.80 mpl, the methamphetamine was a contributing factor to the crash. When somebody has a level of 0.80 mpl, that level is within a range which guarantees that there will be effects on his coordination and attention that inevitably will affect everything he does, including driving. Dr. Logan further stated that the way methamphetamine works is that when somebody takes it acutely, the symptoms are typically excitatory, euphoria, lots of energy, high alertness, hyper vigilance, but as

12

the drug starts to wear off, the effects are kind of a rebound effect, so a person becomes sleepy and lethargic, somnolence, loses coordination, and loses attention. According to Dr. Logan, the studies indicate that driving behaviors such as crossing into oncoming traffic are typically associated with higher blood-methamphetamine levels.

After the *Daubert* hearing, the trial court overruled appellant's objection and allowed Dr. Logan to testify. Viewed in light of the non-exclusive, flexible *Kelly* factors, Dr. Logan's testimony supports the following conclusions: he is eminently qualified in his field; his theory and technique have been subjected to peer review, and techniques similar to his have been accepted as valid not only in the United States but also in other countries; literature supports his theory and technique; his theory and technique could be explained clearly to the court; and other experts have tested and evaluated the technique he used.

We also emphasize the limited and specific scope of Dr. Logan's expert opinion regarding appellant's consumption of methamphetamine—a limited scope which lessens the importance of the lack of assignment of an error rate to the studies' findings. Dr. Logan did not speculate regarding how the methamphetamine affected appellant, what phase of the drug appellant was in at the time of the accident, or whether appellant fell asleep at the wheel. Instead, Dr. Logan essentially testified that, although there is no set blood-methamphetamine level above which a person is considered intoxicated as a matter of law, such as the 0.08 rate applying to alcohol consumption, appellant's rate of 0.80 mpl was so high that his coordination, attention, and driving-ability must have been affected and, in that regard, contributed to the accident. *See Jackson v. State*, 50 S.W.3d 579, 587–88 (Tex. App.—Fort Worth 2001, pet. ref'd) (affirming trial court's ruling that expert's opinion that appellant's blood-cocaine level was "high" at the time of fatal

13

traffic accident was reliable); *Durham v. State*, 956 S.W.2d 62, 65–66 (Tex. App.—Tyler 1997, pet. ref'd) (affirming trial court's ruling that expert's opinion that appellant's blood-marijuana level two hours after fatal traffic accident indicated he was intoxicated at time of accident was reliable).

Dr. Logan formulated this opinion having found in his research that, as one would expect, a person becomes more intoxicated as he consumes more methamphetamine, a drug with known stimulant and withdrawal phases. Although, as Dr. Logan acknowledged, more research needs to be performed before science will arrive at a definitive blood-methamphetamine level indicating intoxication, we conclude the trial court's admittance of Dr. Logan's limited opinion was within the zone of reasonable disagreement. *See generally People v. Bui*, 86 Cal. App. 4th 1187 (Cal. App. 3rd Dist. 2001) (holding Dr. Logan's expert testimony—which was similar to his testimony in the present case—was reliable because it was based on established epidemiological studies).[2]  We overrule appellant's second issue.

### III. JURY CHARGE

In his third, fourth, and fifth issues, appellant contends the trial court erred in its submission of the jury charge by (1) including an instruction that the lawyers' questions are not evidence, (2) refusing to include an application instruction regarding concurrent causation, and (3) refusing to submit the lesser-included offense of criminally negligent homicide.

---

[2] We recognize that the fact another trial court has previously allowed scientific testimony by a particular witness does not mean the witness's testimony is *ipso facto* scientifically reliable in the present case. *Hernandez v. State*, 116 S.W.3d 26, 30 (Tex. Crim. App. 2003).

## A. Standard of Review

Claims of charge error are subject to a two-step inquiry. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). First, we determine if there was error in the charge. *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). If so, then we determine whether the appellant was harmed by the error. *Id.* When, as here, the appellant objected to the error in the trial court, we will reverse if the error caused "some harm," that is, if the error was "calculated to injure the rights of the defendant." *Id.* (citing *Almanza*, 686 S.W.2d at 171).

## B. Instruction on Lawyer Questions

In his third issue, appellant contends the trial court erred by submitting the following instruction to the jury:

> Statements made by the lawyers are not evidence. The questions asked by the attorneys are not evidence. Evidence consists of the testimony of the witnesses and materials admitted into evidence.

Appellant argues this instruction confused the jury and prejudiced him because he spent considerable time cross-examining witnesses with leading questions. Appellant contends that, because leading questions are often answered with a "yes" or "no," this instruction was a judicial comment that appellant's cross-examination was improper.

It is well-settled that attorney questions are not evidence. *See Madden v. State*, 242 S.W.3d 504, 513 n.23 (Tex. Crim. App. 2007). Moreover, the submitted instruction was taken verbatim from the Texas Criminal Pattern Jury Charges. *See* State Bar of Tex., Tex. Pattern Jury Charges—Crimes Against Persons § C2.1 (2011). Contrary to appellant's argument, this type of evidentiary instruction is proper. We overrule appellant's third issue.

15

## C. Concurrent Causation

In his fourth issue, appellant contends the trial court erred by refusing to submit a paragraph on concurrent causation in the application portion of the jury charge. The Penal Code includes the following section pertaining to concurrent causation:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

Tex. Penal Code Ann. § 6.04(a) (West 2011). The trial court included this law in the abstract portion of the charge but refused appellant's request that the law be applied to the facts in the application portion.

The State presented evidence supporting a finding that appellant caused the traffic accident because he was under the influence of methamphetamine. Contrarily, appellant testified that his consumption of the methamphetamine did not affect his mental or physical faculties and that the accident occurred because he fainted due to tussive syncope. To the extent these "causes" occurred concurrently, they do not support submission of a section 6.04(a) instruction because both causes involved appellant's conduct, and appellant admitted he consumed methamphetamine. *Robbins v. State*, 717 S.W.2d 348, 351 n.2 (Tex. Crim. App. 1986) (holding section 6.04(a) instruction inapplicable because the concurrent causes both involved the defendant's conduct). "An actor's conduct is not broken down such that it constitutes separate 'causes,' at least where the attributes which comprise the conduct are both admitted to have occurred, i.e., exhaustion and the imbibing of intoxicating liquor admittedly occurred together." *Id.*

16

Furthermore, section 6.04(a) does not apply to the extent "causes" were not concurrent but alternatives (i.e., the State argued appellant fell asleep because he had consumed methamphetamine, contrarily, appellant argued he fainted due to coughing). *See Barnette v. State*, 709 S.W.2d 650, 651 (Tex. Crim. App. 1986) (distinguishing alternative and concurrent causation); *Williams v. State*, 630 S.W.2d 640, 645 (Tex. Crim. App. 1982) (same). We overrule appellant's fourth issue.

## D. Lesser-Included Offense

In his fifth issue, appellant contends the trial court erred by refusing to submit his requested instruction on the lesser-included offense of criminally negligent homicide.

### 1. Law

In determining whether the trial court should have granted a defendant's request for a lesser-included offense, we apply the two-prong *Rousseau* test. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993); *see also Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). First, we determine whether the offense is a lesser-included offense of the alleged offense. *Rousseau*, 855 S.W.2d at 672–73.

If so, we then determine whether there is some evidence in the record that would permit a jury rationally to find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.* The evidence must establish that the lesser-included offense is a valid, rational alternative to the charged offense. *Goad*, 354 S.W.3d at 446. Anything more than a scintilla of evidence is sufficient to entitle the defendant to a lesser charge. *Id.* We review all of the evidence in the light most favorable to the requested lesser-included offense, whether the evidence

was produced by the State or the defendant, and whether it be strong, weak, unimpeached, or contradicted. *Id.* at 446–47; *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). Although this threshold showing is low, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted. *Sweed*, 351 S.W.3d at 68. This standard is satisfied if some evidence refutes or negates other evidence establishing the greater offense or if the evidence presented is subject to different interpretations. *Id.*

### 2. Analysis

The parties agree that criminally negligent homicide is a lesser-included offense of manslaughter. *See Wasylina v. State*, 275 S.W.3d 908, 910 (Tex. Crim. App. 2009). Hence, we must determine whether there is any evidence that would permit a jury rationally to find that, if appellant is guilty, he is guilty only of the lesser-included offense. *Hall*, 225 S.W.3d at 536.

A person commits the second-degree felony offense of manslaughter when he "recklessly causes the death of an individual." Tex. Penal Code § 19.04 (West 2011).

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(c) (West 2011). A person commits the state-jail felony offense

18

of criminally negligent homicide when he "causes the death of an individual by criminal negligence." *Id.* § 19.05(a) (West 2011).

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d). Accordingly, appellant was entitled to an instruction on criminally negligent homicide if there is some evidence supporting a rational finding that he was not aware of the risk of driving while under the influence of methamphetamine but should have been. *See, e.g.*, *Jackson v. State*, 248 S.W.3d 369, 371–72 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("The key to criminal negligence is the failure of the actor to perceive the risk created by his conduct. Before a charge on criminally negligent homicide is required, the record must contain evidence showing an unawareness of the risk." (citation omitted)). We recognize that evidence regarding a defendant's culpable mental state is usually circumstantial, not direct. *See McGowan v. State*, 375 S.W.3d 585, 591 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). The issue of whether recklessness or criminal negligence is shown—that is, whether one is aware of the risk or simply fails to perceive it—is a conclusion to be drawn through inference from all the circumstances. *Stadt v. State*, 120 S.W.3d 428, 438–39 (Tex. App.—Houston [14th Dist.] 2003), *aff'd*, 182 S.W.3d 360 (Tex. Crim. App. 2005).

Appellant testified that he is a career truck driver who began working at his father's truck stop when he was thirteen-years old. According to appellant, on the day of the accident, he was employed as a cattle hauler for Southern Livestock and

19

was instructed to deliver cattle to a location which required an overnight drive. Appellant retrieved his semi-truck from the repair shop and inspected it "to make sure everything was working right." Appellant testified he consumed "[s]ome kind of synthetic stuff" in order to stay awake all night. When asked what he knew about the substance, appellant testified as follows:

[Appellant:] I didn't know exactly what it was, but I found out later it contained methamphetamine. But it wasn't produced to me as a methamphetamine. It said it didn't have no methamphetamine in it. But I would crush it up and put it in a piece of paper towel, and I'd swallow it. And it didn't make me feel hyper or nothing like that. It would just keep me awake because I was going to be up all night[.]

. . .

[Appellant's counsel:] Did you black out because of the use of any controlled substance?

[Appellant:] No, sir. I had done methamphetamine before this, and I never -- never passed out. And -- I mean, I have done this substance, I thought was not methamphetamine, which turned out to be.

[Appellant's counsel:] Was it -- did it look the same as the meth that you had ever used or --

[Appellant:] No.

[Appellant's counsel:] Okay. And what did you subsequently find out about this product?

[Appellant:] It would keep me awake.

[Appellant's counsel:] No, sir. But with that particular product, did you find out any of the history of it or where it come from or anything --

[Appellant:] It came from Mexico is all I know.

[Appellant's counsel:] So it was some kind of a -- not a new invention, but a product that was being prepared --

[Appellant:] It was supposed to be something different, something new.

[Appellant's counsel:] Something new and something different.

[Appellant:] Yes.

[Appellant's counsel:] And where did you physically get this product?

[Appellant:] From a guy in San Anton (sic) from a guy named "Bubba."

[Appellant's counsel:] Bubba have a real name?

[Appellant:] Bubba Jenkins is all I know.

On cross-examination, appellant testified as follows:

[Prosecutor:] Okay. Would you agree with me that it's never appropriate for a commercial truck driver to take methamphetamine --

[Appellant:] Yes.

[Prosecutor:] -- and get behind the wheel of an 18-wheeler?

[Appellant:] I'm aware of it. Yes, sir.

…

[Prosecutor:] All right. You've indicated to us that you looked at your truck before you left on the trip?

[Appellant:] Yes.

[Prosecutor:] And there was no mechanical problems, was there?

[Appellant:] No, sir.

[Prosecutor:] And you also indicated that you took a substance that you didn't know what it was in an effort to stay awake while you were driving?

[Appellant:] Yes.

[Prosecutor:] Correct?

[Appellant:] Yes, sir.

[Prosecutor:] Okay. And when -- then you got into a wreck, correct?

[Appellant:] Yes, sir.

[Prosecutor:] All right. And when you went to the hospital after you've taken this unknown substance that you don't know what it is and then you pass out, according to you, you didn't tell the hospital hey -- when they asked you what -- what you were on or what you had taken, that you never said, "hey, I took something. I don't know what I took, but I passed out." It didn't occur to you that that might be important in figuring out what happened?

[Appellant:] No, sir.

[Prosecutor:] Probably more correct that you actually did know what you

21

were on, and it was methamphetamine?

[Appellant:]  I knew, yes, sir.

[Prosecutor:]  You knew you were on methamphetamine?

[Appellant:]  Yes.

[Prosecutor:]  So you knew --

[Appellant:]  But it didn't have anything to do with me passing out.

[Prosecutor:]  Yeah.  And you didn't tell the doctor that you were using methamphetamine when you went in?

[Appellant:]  No, sir.

[Prosecutor:]  So that's an omission in your medical records, correct?

[Appellant:]  A what?

[Prosecutor:]  You left something out?

[Appellant:]  Yes, sir.

…

[Prosecutor:]  And you've taken methamphetamine before, correct?

[Appellant:]  Yes, sir.

[Prosecutor:]  And you know you shouldn't take methamphetamine and drive?

[Appellant:]  Yes, sir.

Appellant argues that a jury could reasonably find from the evidence that he was criminally negligent, but not reckless, due to appellant's initial testimony that he did not know the contents of the substance from Mexico that he ingested before the accident.  We disagree.  Appellant had previously served jail time for a methamphetamine-related offense, he had used methamphetamine, and as a career truck driver he knew it was never appropriate for a commercial truck driver to take methamphetamine and get behind the wheel of an 18-wheeler.  He admitted that he had consumed a substance containing methamphetamine on the day of the fatal accident.  He clearly and unequivocally testified that, at the time of the accident, he *did* know he was on methamphetamine.

22

In this case, there is no evidence supporting a rational finding that appellant was not aware of the risk of driving while under the influence of methamphetamine. Further, appellant's sworn testimony establishes he knew he was driving under the influence of methamphetamine. Accordingly, the trial court did not err in refusing to submit an instruction on the lesser-included offense of criminally negligent homicide. We overrule appellant's fifth issue.

### III. MOTION TO QUASH

Finally, in his sixth issue, appellant contends the trial court erred by failing to grant his motion to quash his manslaughter indictment. When recklessness is part of an offense, the State must allege the acts relied upon to constitute recklessness with reasonable certainty, and it is never sufficient for the State to merely allege that the accused acted recklessly. Tex. Code Crim. Proc. Ann. art. 21.15 (West 2009); *Smith v. State*, 309 S.W.3d 10, 14 (Tex. Crim. App. 2010).

Appellant was charged with manslaughter by the following language:

[Appellant], heretofore on or about February 17, 2010, did then and there recklessly cause the death of another, namely [the three victims], to-wit: while driving eastbound on the Interstate 10 freeway after ingesting methamphetamine and amphetamine, [appellant] failed to properly control his vehicle, left the said freeway, crossed over the median separating the eastbound and westbound lanes of freeway traffic, entered the westbound portion of the said freeway going the wrong direction and collided with [vehicles] traveling westbound that [were] occupied by [the victims].

Appellant contends it is unclear from this language whether the allegation that he ingested methamphetamine is purported to be a reason why he acted with recklessness in causing the accident.

Even if the State's recklessness allegation was not specific enough to meet the requirements of section 21.15, any such error was harmless. Defects of

23

substance contained within an indictment are reversible only if the error is shown to have affected appellant's substantial rights under a Rule 44.2(b) harm analysis. Tex. R. App. P. 44.2(b); *Mercier v. State*, 322 S.W.3d 258, 264 (Tex. Crim. App. 2010). As part of this analysis, we must determine whether, in the context of the case, the error had an impact on the defendant's ability to prepare a defense. *See Trejos v. State*, 243 S.W.3d 30, 42 (Tex. App.—Houston [1 Dist.] 2007, pet. ref'd); *see also Adams v. State*, 707 S.W.2d 900, 903 (Tex. Crim. App. 1986).

It is obvious appellant was fully aware that the State alleged he recklessly caused the accident because he was under the influence of methamphetamine. Appellant defended against this allegation by presenting an expert witness who opined that tussive syncope, not appellant's consumption of methamphetamine, was the reason he drifted into oncoming traffic. It is also clear the jury was aware—from opening statements to closing argument—that the State accused appellant of acting recklessly because he consumed methamphetamine which caused him to crash into the victims' vehicles. Consequently, we hold that any lack of specificity in the indictment did not affect appellant's substantial rights. We overrule appellant's sixth issue.

We affirm the trial court's judgment.


/s/     Margaret Garner Mirabal
          Senior Justice

Panel consists of Justices Boyce, McCally, and Mirabal. (McCally, J., concurring).[3]

Publish — Tex. R. App. P. 47.2(b).

---

[3] Senior Justice Margaret Garner Mirabal sitting by assignment.

24