[No. C029902. Third Dist. Feb. 7, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
THANG VAN BUI, Defendant and Appellant.

## COUNSEL

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Carlos Martinez and Alison Elle Aleman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SCOTLAND, P. J.**—A jury convicted defendant Thang Van Bui of vehicular manslaughter while driving under the influence of a drug and making an unsafe lane change (Pen. Code, § 192, subd. (c)(3); Veh. Code, §§ 21658, subd. (a), 23152), and he was sentenced to state prison for the lower term of one year and four months.

On appeal, defendant contends the trial court erred in admitting expert testimony indicating that defendant's use of methamphetamine affected his

ability to operate his vehicle safely. In defendant's view, the expert used a novel technique that has not gained general acceptance in the scientific community and, thus, the expert testimony did not satisfy the test of admissibility set forth in *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and reiterated in *People v. Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321]. He also contends that the information considered by the expert was not the type that reasonably may be relied on by an expert. We disagree with both contentions.

As we will explain, the expert's testimony concerning the effects of methamphetamine on human behavior was based upon a method of research that is generally accepted in the scientific community. So, too, was the expert's opinion that a person with the concentration of methamphetamine in his blood that defendant had, and who demonstrated symptoms like defendant's, would not have the ability to drive safely. Defendant's criticism of the expert testimony goes only to its weight, not its admissibility. Accordingly, we shall affirm the judgment.

## FACTS

Sometime before 1:00 a.m. on March 12, 1997, California Highway Patrol (CHP) officers responded to a report of a traffic accident on Highway 99, just north of the Florin Road overcrossing. On the shoulder of the road facing the opposite direction of traffic, they found a severely damaged Nissan Maxima, which had been driven by defendant. A large truck had penetrated the cinder block sound barrier wall along the freeway, and the truck's trailer had overturned.

Based upon the physical debris and collision evidence recovered during the investigation, the CHP determined that defendant's vehicle entered lane four of northbound Highway 99 from the west Florin Road entrance, and then moved to lane three, into the path of the truck. The truck's right front wheel struck the rear of defendant's Maxima, and the truck ran up onto the car, causing both vehicles to veer right toward the shoulder and sound wall. The truck penetrated the sound barrier wall, and its driver, George Blanke, died at the scene as a result of severe head injuries.

Defendant was dazed, incoherent, and walking around on the shoulder of the freeway when CHP officers arrived. He told one of the officers that he had come onto the freeway and hit a truck. After defendant was taken to the hospital, he stated he had merged into the number three lane and had been in that lane for some time when his car was struck on the left side by a truck. According to defendant, he never saw the truck prior to impact.

Upon defendant's arrival at the hospital, his blood pressure, pulse rate, respiration, and temperature were all normal according to the hospital's records. Later, when Officer Timothy Rickard, a trained drug recognition evaluator, examined defendant he noted that defendant's pupils were dilated to 7.5 millimeters, were slow to constrict, and engaged in rebound dilation in response to a light stimulus. Defendant also exhibited eyelid tremors. Rickard took defendant's pulse on three different occasions; the results were elevated each time, ranging from 116 to 120 beats per minute. Furthermore, defendant's respiration was elevated, and he was unable to accurately perceive the passage of time; when asked to say stop when 30 seconds had passed, defendant let 52 seconds elapse. In Rickard's opinion, these symptoms indicated defendant was under the influence of a central nervous system stimulant. Rickard obtained a blood sample, which disclosed that defendant's blood contained .04 milligrams per liter of amphetamine and .3 milligrams per liter of methamphetamine.

Dr. Barry Logan, a forensic toxicologist, testified for the prosecution at trial. Logan had conducted two studies concerning the effects of methamphetamine on behavior; both of his studies were published in the Journal of Forensic Sciences. One study correlated methamphetamine blood levels to driving impairment based on statistics culled from traffic accidents in the State of Washington. Logan explained that the effects of methamphetamine included increased risk-taking, distractibility, jumbled speech, changes in perception, changes in vision caused in part by dilated pupils, and changes in mood such as paranoia, agitation, and irritability. When the drug starts to wear off, people became very fatigued, and have a slower response time. In Logan's opinion, both methamphetamine use and withdrawal affect a person's ability to drive.

According to Logan, therapeutic doses of methamphetamine generally range from 5 to 10 milligrams per day, but can be as high as 60 milligrams per day. Logan would expect to find a methamphetamine blood level concentration of up to .2 milligrams per liter in a person receiving the higher therapeutic dosage of 60 milligrams per day. The Physicians Desk Reference warns physicians that therapeutic dosages of 5 to 10 milligrams per day may affect a person's ability to drive or operate heavy machinery.

In Logan's opinion, the following evidence would demonstrate that a person's ability to drive a motor vehicle was impaired by the use of methamphetamine: the person was in an accident similar to the one caused by defendant; the person had a concentration of .3 milligrams of methamphetamine per liter of blood; his pupils were dilated to 7.5 millimeters, were sluggish in their reaction to light, and demonstrated a mild rebound effect

when so stimulated; he showed symptoms of eyelid tremors; and he had an elevated pulse about two hours after the accident. In fact, Logan opined that any driver whose blood level exceeded the therapeutic dosage range probably had an impaired ability to drive safely.

Prior to Logan's testimony, defendant objected to its admission. Citing *People v. Kelly, supra,* 17 Cal.3d 24 (*Kelly*), Evidence Code section 801, subdivision (b), and Evidence Code section 803, defendant argued Logan's opinion was based on a new scientific technique that was not generally accepted or reliable and, thus, was not the proper basis for an expert opinion.

Outside the presence of the jury, Logan explained that his opinion was based on literature and statistics he reviewed and studies he performed in writing his two papers *Methamphetamine and Driving Impairment* and *Cause and Manner of Death in Fatalities Involving Methamphetamine.* These papers had been subjected to peer review, which meant they had been reviewed to determine that appropriate methods were used and that the data supported the conclusions.

Logan reviewed statistics and data on traffic accidents and fatalities in which (1) methamphetamine use was involved, (2) the drivers' blood levels were tested, and (3) there were eyewitness reports regarding the drivers' behavior. He also reviewed laboratory studies regarding the effects of methamphetamine on behavior. Logan conducted an epidemiological study, which involves studying the demographics and characteristics of members of a large population with respect to a particular property or characteristic and then drawing inferences about the broader population based on that evaluation. He explained that this is a valid and accepted method of scientific research, which has been used within the scientific community for 200 years.

Logan conceded that some of the traffic accident statistics he reviewed involved people who had used alcohol or other drugs in addition to methamphetamine. He was not aware of any other studies like his, or of any studies in which the subjects were given methamphetamine and then placed in driving simulators to directly observe the effects of methamphetamine on driving ability. He also acknowledged that a person's methamphetamine blood level does not definitively reveal whether the person recently took a small dose of methamphetamine and was in an active state of intoxication, or whether the person took a larger dose a long time ago and was in withdrawal. But Logan explained that this did not affect his opinion regarding the correlation of methamphetamine blood levels to driving impairment because a person's driving ability would be impaired whether the person was high or going through withdrawal.

Dr. Stephen Pittel, a psychology professor and forensic consultant, testified for the defense at the hearing on defendant's objection to Dr. Logan's testimony. Pittel stated that no one had done studies like those conducted by Logan, and he disagreed with Logan's conclusions. In Pittel's view, the statistics used by Logan, concerning traffic fatalities in which drivers had used methamphetamine, did not establish a causal link between the use of methamphetamine and the traffic accident.

Pittel stated there are three reasons why extrapolations cannot be made regarding driving impairment based purely on methamphetamine blood levels, without concomitant behavioral indicators of impairment. First, it is impossible to tell how long a methamphetamine dose has been in a person's system, i.e., whether the blood level is a result of recent usage of a small dose or the consumption of a larger dose taken a long time ago. Second, a person who has developed a tolerance will be able to take a higher dose without the same degree of impairment as someone who has not built up a tolerance. Third, according to another authority, Dr. Stephen Karsh, blood levels do not correlate well with impairment.

In Pittel's opinion, defendant's behavior after the accident showed signs of methamphetamine use, but not intoxication. In order to conclude that a person was impaired by methamphetamine, Pittel would expect to see such behavioral symptoms as agitation, paranoia, irritability, pressured speech, increased risk-taking, or hallucinations.

Although he disagreed with Logan's conclusions, Pittel acknowledged that Logan used an accepted method of scientific research. Pittel also noted he was unable to find many studies or information regarding methamphetamine use and driving impairment.

The trial court ruled that *Kelly* did not preclude the admission of Logan's testimony because he used generally accepted research methods and not a new scientific technique to reach his conclusions regarding the correlation between methamphetamine blood levels and the impairment of a person's driving ability. Acknowledging that there was a dispute between Logan and Pittel about whether one could make extrapolations regarding driving behavior from methamphetamine blood concentrations, the court concluded that defendant's objections to Logan's testimony went to its weight and not to its admissibility. Accordingly, the court allowed Logan to testify regarding whether defendant was under the influence of methamphetamine such that his driving ability was impaired at the time of the accident.

Thereafter, Logan testified at trial as stated previously, but Pittel did not testify for the defense.

## DISCUSSION

The relevant statutes do not proscribe the operation of a vehicle with a specific measurable amount of methamphetamine in the blood; rather, they require proof that defendant was driving "under the influence" of methamphetamine. (Pen. Code, § 192, subd. (c)(3); Veh. Code, § 23152.) A person is under the influence within the meaning of the statutes when, as a result of using methamphetamine, his physical or mental abilities are impaired to such a degree that he no longer has the ability to drive his vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances. (*People v. Enriquez* (1996) 42 Cal.App.4th 661, 665 [49 Cal.Rptr.2d 710].)

Whether defendant was "under the influence" was a question of fact for the jury to determine from all the proven circumstances of the case. (*McDonald v. Department of Motor Vehicles* (2000) 77 Cal.App.4th 677, 687 [91 Cal.Rptr.2d 826].) Dr. Logan's testimony was introduced to assist the jury in resolving this question.

Citing *Kelly, supra,* 17 Cal.3d 24, defendant contends the trial court erred in admitting Logan's testimony because it was based on a new scientific technique, correlating the degree of a person's driving impairment with methamphetamine blood levels, that was not generally accepted in the scientific community.

*Kelly* held that the admissibility of expert testimony based on a new scientific technique requires proof of its reliability. *(Kelly, supra,* 17 Cal.3d at p. 30; accord, *People v. Leahy, supra,* 8 Cal.4th at pp. 594, 604; *Wilson v. Phillips* (1999) 73 Cal.App.4th 250, 254 [86 Cal.Rptr.2d 204].) The proponent of the testimony must show that (1) the technique has gained general acceptance in the particular field to which it belongs, (2) any witness testifying on general acceptance is properly qualified as an expert on the subject, and (3) correct scientific procedures were used in the particular case. (*Kelly, supra,* 17 Cal.3d at p. 30.)

Defendant disputes that the technique used by Logan to draw conclusions regarding driving ability from methamphetamine blood levels has gained general acceptance in the scientific community. Characterizing Logan's testimony as a "first-time-ever approach," defendant contends the question of "general acceptance" is a mixed question of law and fact subject to a limited de novo review, giving deference to the trial court's credibility and factual findings, and deciding as a matter of law whether these findings establish that there has been general acceptance in the relevant scientific

community. (*People v. Morganti* (1996) 43 Cal.App.4th 643, 663 [50 Cal.Rptr.2d 837].)

In applying the *Kelly* standard, it is important to distinguish between expert testimony and scientific evidence; the former is not subject to the special admissibility rule of *Kelly*, which applies to cases involving novel devices or processes. (*People v. McDonald* (1984) 37 Cal.3d 351, 372-373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], disapproved on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 913 [98 Cal.Rptr.2d 431, 4 P.3d 265]; *People v. Stoll* (1989) 49 Cal.3d 1136, 1156 [265 Cal.Rptr. 111, 783 P.2d 698] [*Kelly* apples only to limited class of expert testimony based on a technique, process, or theory that is new to science]; *People v. Ward* (1999) 71 Cal.App.4th 368, 373 [83 Cal.Rptr.2d 828].)

This distinction is based on the fact that "[w]hen a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative. [Citation.]" (*People v. McDonald, supra,* 37 Cal.3d at pp. 372-373.)

"The *Kelly* test is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate. . . . In most other instances, the jurors are permitted to rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them." (*People v. Venegas* (1998) 18 Cal.4th 47, 80 [74 Cal.Rptr.2d 262, 954 P.2d 525], citations omitted.)

■ Contrary to defendant's claim, Dr. Logan's testimony that the use of methamphetamine in greater than therapeutic dosages results in impaired driving did not involve a novel process or a new scientific technique or device. Logan's opinion was the product of epidemiological studies he conducted. His studies had resulted in two published papers that were subjected to peer review. As Logan explained to the trial court, epidemiological studies and reviews of existing literature are common, valid, and accepted tools of scientific research, which have been in use within the scientific community for the past 200 years. Even defendant's expert, Dr.

Pittel, agreed that Logan had used "an accepted method of scientific research." That Pittel disagreed with the conclusions Logan drew from his research does not make Logan's methodology a new scientific technique.

Accordingly, the trial court correctly ruled that Logan's testimony was admissible under the *Kelly* standard because it was based not on a new scientific technique, but on a method of research that is generally accepted within the scientific community.

■   Defendant also contends the trial court erred in admitting Dr. Logan's testimony because it did not comport with Evidence Code section 801, subdivision (b). That section limits expert opinion testimony to an opinion "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . ."

In determining whether to admit expert testimony, the trial court has broad discretion, and we may not interfere with that discretion unless it is clearly abused. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506 [68 Cal.Rptr.2d 135].)

Logan relied on scientific literature, statistical data, and an epidemiological study, all of which are the type of matter that reasonably may be relied on by an expert in forming an opinion. Defendant simply disagrees with the conclusion that Logan drew from these materials. In doing so, defendant relies on Dr. Pittel's testimony. But Pittel's opinion goes only to the weight to be afforded Logan's opinion, not its admissibility. Defendant was free to cast doubt on Logan's reasoning via cross-examination or rebuttal by a defense expert.

At a minimum, the statistical evidence relied on by Logan showed a correlation between increasing methamphetamine blood levels and increasingly impaired behavior of the type likely to affect driving ability. In light of the lack of more direct evidence or studies regarding methamphetamine use and driving impairment, it was not unreasonable for Logan to rely on this information in forming his opinion that the use of methamphetamine in greater than therapeutic dosages impairs driving ability. Nor was it unreasonable for Logan to rely on other literature regarding the effects of methamphetamine on behavior and performance.

"The reasonableness of an expert's reliance is a question of degree, and may well vary with the circumstances. Where . . . there is little or no direct

evidence upon which the expert can base an opinion, the expert may have to turn to forms of circumstantial evidence on which he might not otherwise rely. In such circumstances, the necessity for the information dictates that courts accord to experts somewhat greater latitude in sources of information than might otherwise be the case." (*Buckwalter v. Airline Training Center* (1982) 134 Cal.App.3d 547, 553-554 [184 Cal.Rptr. 659].)

For the reasons stated above, the trial court did not abuse its discretion in allowing the prosecution to introduce Logan's expert testimony.

### DISPOSITION

The judgment is affirmed.

Nicholson, J., and Callahan, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 2, 2001.