Filed 4/23/13  P. v. Vega CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G045613 |
| v. | (Super. Ct. No. 07CF2786) |
| LEONEL VEGA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Leonel Vega of first degree murder and active participation in a criminal street gang, and found true allegations he vicariously discharged a firearm causing death, committed murder for the benefit of a criminal street gang, and murdered the victim to further the activities of a criminal street gang.

After denying his new trial motion, the trial court sentenced Vega to life without the possibility of parole for the murder, plus 25 years to life for gun use, and a concurrent two-year term for active participation in a criminal street gang, which the court stayed pursuant to Penal Code section 654.

Vega argues the trial court abused its discretion and violated his state and federal Constitutional rights to due process and to present a defense by excluding the testimony of two defense expert witnesses on the culture of inmate informants. We find no error and affirm the judgment.

FACTS

*The Prosecution's Case*

One evening in March 2004, Giovani and Andrew Onofre and Hector Lopez decided to play basketball at Memorial Park in Santa Ana, an area claimed by both the Alley Boys and Delhi criminal street gang members. The three teenagers played basketball until it got dark. They tried to get a ride home, but ended up waiting for a bus at a nearby bus stop. While they were waiting for the bus, a white Lincoln Town Car pulled up in front of them. Vega, an active participant in the Delhi gang, was a passenger in the car. He made a "D" handsign, although it is not clear Giovani saw him do this.

According to Andrew and Lopez, Giovani thought he knew someone in the car, and mentioned that they were stopping to give them a ride home. When he approached the car and said, "what's up[,]" Vega got out of the car and asked the three where they were from. Giovani said he was from Alley Boys. Vega got back into the

2

car, said something to the driver, and grabbed a semiautomatic handgun. He fumbled with the gun, which gave Giovani a chance to run and jump over a brick fence. Andrew and Lopez ran in the opposite direction and hid behind some dumpsters.

Vega got back into the car, and the car made a U-turn. Lopez saw the car circle the park a couple of times, and he thought the car's occupants were after them. Lopez searched for Giovani without success, and either he or Andrew used a cell phone to call the police. Police officers responded within minutes. Andrew heard a gunshot over the police radio, and Lopez heard there had been a homicide in another location.

Santa Ana Police officers found Giovani dead close to a construction site a short distance from the bus stop. He had been shot in the head and there was a spent nine-millimeter Speer brand shell casing about 20 feet from his body. A worker at the construction site heard a gunshot and then saw a white Lincoln Town Car drive by, run a stop sign, and disappear from sight.

A few days later, a police officer on patrol in the area of Broadway and Anahurst Streets in Santa Ana saw a white Lincoln Town Car that matched the description of the car involved in the homicide. The officer attempted to make a traffic stop, but the car sped away. After a high-speed pursuit through a residential area, the car pulled to the curb and Vega got out and ran away. He was apprehended by other officers, and as he was escorted to the police patrol car, Vega yelled, "This is Delhi."

During a search of the car, officers found a .380-caliber handgun, a package of live ammunition, which included .357 magnum cartridges, 14 Speer nine-millimeter cartridges, and nine Winchester nine-millimeter cartridges, in the driver's door interior panel. A .357 revolver was found in the right front passenger seat. The investigating officers noted the car had a missing front grille, other damage to the front end, and a donut spare tire mount on the right front wheel, details Lopez and Andrew either did not notice or mention.

Lopez said the car had a V-shaped antenna on the back of the car, something Vega's car lacked, and he was unable to positively identify Vega's car at trial. However, he had identified Vega's car from a photograph in 2004, and the photograph did not show an antenna of the type Lopez described. He identified Vega as someone resembling the shooter from a photographic lineup in 2006.

Andrew remembered a white, two-door car with a "V" antenna on the back, but he did tell police officers Vega's car looked very similar to the one involved in the shooting. In 2007, he identified Vega from a photographic lineup, although he also told police officers the passenger in the car was of a darker complexion and appeared younger than the people in the lineup. At trial, he identified Vega and said, "I can't forget his eyes."

Rocky Edwards, a forensic firearm and tool mark examiner, analyzed and compared the cartridge casing found at the homicide scene with the live cartridges recovered from the car Vega was driving. He found that the fired cartridge case had the same bunter mark as six of the unfired Speer nine-millimeter cartridges. This fact, according to Edwards, indicates the spent nine-millimeter cartridge found by Giovani's body was made by the same machine in the same factory as the six unfired Speer cartridges. Edwards also matched extraction marks from five of the unfired Winchester nine-millimeter cartridges found in the car to extractor marks on the cartridge casing from the homicide scene, which indicated they had been cycled through the same gun.

Julio Ceballos, another Delhi gang member, testified he saw Vega at a Delhi gang gathering the day after the shooting. Vega was holding up a newspaper from the day before, referred to an article about the homicide, and bragged that he had been the

4

shooter. Vega claimed he killed an Alley Boys gang member, and he said Joey Soto,[1] another Delhi gang member, was with him at the time. Ceballos also said Vega had a .357 revolver at the party, but he claimed to have used and then dumped a nine-millimeter, slide-action handgun to kill the Alley Boys gang member.

Johnny Belcher, a former member of the Delhi gang who had known Vega for about 16 years, talked to Vega while they were both in jail for their respective criminal cases. Belcher acknowledged a grant of use immunity in exchange for his testimony. According to Belcher, Vega told him that he and Soto were driving around a rival gang's neighborhood, looking for rival gang members, when he came across a "youngster" at a bus stop. He pretended to be from the Alley Boys gang, a fierce rival of the Delhi gang, and asked the youngster and his companions if they wanted a ride. Vega said he convinced one of the boys to get into the car, then drove him to a neighborhood by some train tracks and shot him in the head.

Oscar Moriel, another Delhi gang member, also had conversations with Vega when they were both incarcerated. He wrote down some of what Vega told him, including threats Vega made against Ceballos to dissuade him from testifying. Vega told Moriel he had murdered someone when "he was cruising around the Memorial Park area with my homeboy [Soto]." He said that he and Soto "were looking for fools from Alley Boys to smoke, to kill." He saw some people standing around the bus stop, pretended to be from the Alley Boys gang, and asked the group where they were from. They said, Alley Boys. Vega said they should "'go bang on them hypes.' Hypes is a derogatory term [that] was used for – against Delhi, Delhi gang members. 'Let's go bang on the hypes. Let's go fuck up them cats.'" One of the group got into the car. Moriel stated

---

[1] Soto did not testify at trial. However, the parties stipulated that if called as a witness, Soto would have said he did not know Vega, never identified him in a photographic lineup, and he had not recognized Vega's Lincoln Town Car in a photograph shown to him by police officers or ever been inside the car.

5

Vega told him "[w]hile they were cruising around, [Vega] and [Soto] were telling this dude, 'yeah, fuck the hypes. Let's go smoke a hype.' Showing 'em the guns, saying there were strapped and shit. [¶] And when – when the dude was telling 'em – you know, dissing – dissing the varrio, dissing Delhi, [Soto] and [Vega], they stopped. They say, 'let's get off right here.' And the guy got off and [Vega] smoked him."

The parties stipulated that Delhi was a criminal street gang within the meaning of Penal Code section 186.22. A gang expert opined Vega committed the instant murder for the benefit of the Delhi gang and in association with other Delhi gang members.

*Defense Evidence*

Vega did not testify at trial. Family members testified his white Lincoln Town Car had been inoperable on the day of the homicide, and he had been at home working on the car. Randall Marquez, a passenger in Vega's car when he was arrested, testified the guns and ammo found in Vega's car belonged to him. Marquez had pled guilty to gun and gang charges arising from this arrest.

Belcher had testified he got out of jail on bond the day after he contacted authorities in an attempt to snitch on Vega. Vega called his fiancé to testify she paid the bond, not Belcher's friend. Vega also called two defense private investigators in an attempt to impeach Ceballos. One of these investigators said Ceballos refused to talk to him. Vega also presented evidence none of the fingerprints taken from the outside of his car matched Giovani's prints, and the fact Andrew had once pointed to a different Delhi gang member in a photographic lineup as the person most closely resembling the person who got out of the Lincoln Town Car and brandished a gun.

Vega also called two experts on eyewitness identifications. These witnesses testified to the factors affecting the accuracy of eyewitness, including the affect of fear and gun focus on facial recognition. One of the experts also stated eyewitnesses

6

are subject to error in identifying people from photographic lineups, depending on how they are questioned. The other expert testified eyewitnesses are the least reliable means of identification, stating, "It works at about the level of flipping a coin."

In addition, defense counsel vigorously cross-examined the eyewitnesses, Lopez and Andrew, and the prosecution's informants, Belcher, Ceballos, and Moriel. With respect to the informants, Belcher admitted testifying under a grant of use immunity, which he knew precluded any prosecution as a result of incriminating statements he might make during his testimony. Belcher also admitted committing "violent crimes," including crimes related to his gang lifestyle. He also conceded the Santa Ana Police Department had provided financial assistance to him in the form of $800 per month for rent from the time he was released from jail in May 2009 through October 2010. He acknowledged his pending drug charges, admitted he did not want to go back to jail or state prison, and conceded he wrote down his conversations with Vega and turned over this document to a detective from the Santa Ana Police Department.

Ceballos was serving a term of 33 years to life for being convicted of a felony firearm offense when he testified. Although he received no promises for his testimony, Ceballos admitted pursuing jail authorities with information about Vega in an attempt to get a break on his sentence.

Moriel testified in ankle chains due to his incarceration on a pending attempted murder charge, a crime which he knew carried the risk of a life sentence. He said he hoped his cooperation with the prosecution would result in a reduction in the pending charges or leniency at sentencing. Although Moriel claimed membership in the Delhi gang, he said he had not met Vega until he was incarcerated and spent two weeks in the "hole" with him when both were sent into isolation for disciplinary violations. Later, they were housed in an area with single-man cells and limited prisoner contact. However, during this period, Vega would often stand at Moriel's cell door and talk.

7

Moriel also said he had contemporaneous "involvement" with officials conducting state and federal criminal investigations, but testified none of the authorities he contacted had promised him anything in exchange for his testimony in Vega's case. He also acknowledged his jailhouse informant status, stating he had been working with state authorities, or "handlers," for about six months when Vega crossed his path. Moriel said he had informed on another inmate charged with murder, and at least one other person charged with a lesser crime. He also testified about his own numerous prior criminal offenses, including five previously unsolved homicides. And, he admitted prisoners often exchange paperwork when incarcerated, but asserted they did so "to verify who we are . . . . Basically you exchange paperwork with somebody to let them know that you're not a rat and you're not a child molester, you're not a rapist; that you're an upstanding person as far as our code goes."

DISCUSSION

As part of the defense case, Vega sought to introduce the testimony of Steven Strong, a former Los Angeles Police Department homicide gang investigator with over 20 years experience and expert on jailhouse informants, and Alexandra Natapov, "an academician expert who was very familiar with the federal system and the state system who is qualified in the area of jailhouse informants in federal courts." The stated purpose for their testimony was to assist the jury in its credibility assessment of the prosecution's informants by providing evidence about how the jail setting creates unique opportunities for them to obtain information about other inmates, their sophisticated methods of obtaining information, and the incentives and conditions that may compel them to manufacture evidence.

After hearing Strong's qualifications and the arguments of defense counsel, the trial court characterized his proposed testimony as "collateral impeachment,"

8

"confusing," and an attempt to allow Strong to render an opinion the witnesses testifying under grants of immunity were lying. The court also noted these witnesses had already testified about how they gathered information and parlayed this information with authorities.

Nevertheless, the court decided to hold an Evidence Code section 402 hearing outside the presence of the jury to allow counsel to voir dire Strong. During this hearing, defense counsel elicited Strong's qualifications, including the fact he had handled between 25 and 30 jailhouse informants. He had testified as an expert witness on jailhouse informants in over 25 cases. Half of these informants were in federal institutions and the other half were in state institutions.

With respect to federal prisoners, Strong was aware of various incidences where the informant was given a percentage of money recovered by the government. He stated, "just for instance, if they recover over a million dollars worth of cash in a drug case, or something of that nature, they'll get anywhere from 10 to 20 percent of that." He also testified the advantages of federal incarceration over state incarceration, including better facilities, less overcrowding, better food, and other amenities.

In Strong's opinion, the number one motivation for jailhouse informants to testify is, "a reduced sentence or totally no sentence at all." He also somewhat discounted the testifying informant's fear of retaliation, stating, "the threat to themselves wasn't so much of a personal safety issue because their relationship to the actual case or the people involved in the case. Sometimes they were from another county, so they wouldn't have encountered the person . . . ." He claimed some informants lied to him, claiming they had family to protect when, in fact, they did not have a family.

Strong also testified jailhouse informants use another inmate's paperwork, including their mail, in an attempt to get information about the other person's case. They reach out to the detectives in particular cases and "shop their information to see if it's useful or not or to see if there's anything that you're lacking or you're seeking to firm up

9

your case if you don't have a solid case." He also believed informants sleuth-out which defendants have active cases, try to determine what would be useful to law enforcement detectives, and then attempt to obtain that information. Strong also said jailhouse informants were not the best witnesses because of their extensive criminal records, "So if you don't need them, you always truly try to avoid using them . . . ."

Strong admitted he knew little to nothing about the instant case, including anything about these particular jailhouse informants. After a short cross-examination, the trial court ruled, "My mind hasn't been changed. The one additional opinion was concerning the strength of the prosecution's case. I don't think an expert can render such an opinion as to whether or not informants should be used to bolster a weak case. Certainly not this witness. [¶] There is nothing in his testimony that is not otherwise obvious or hasn't already been testified to."

After this ruling, defense counsel gave an offer of proof for Natapov's testimony. He said her expertise stemmed from research about informants in federal courts, and her testimony would be "generic." The court responded, "I liken that to someone coming in and testifying about people who are wrongly convicted as it turns out. That is not admissible, nor would that be admissible."

The following day, defense counsel submitted a declaration and curriculum vitae from Natapov as an additional offer of proof for her testimony. The court read the documents and stated, "[Natapov's declaration] is largely anecdotal and offers her opinion that jailhouse snitches are inherently unreliable. Her final opinion that 'the use of criminal informants as witnesses, particularly jailhouse informants tends to make it more likely that innocent defendants would be wrongly convicted,' I don't believe that's a proper subject of expert opinion. I will exclude it."

10

*Legal Analysis*

Vega argues the trial court abused its discretion and violated his Sixth and Fourteenth Amendment rights under the United States Constitution by excluding the testimony of Strong and Natapov.[2]

Citing Evidence Code section 801, Vega contends, "[t]the culture of inmate informants, including their unique opportunities, the methods they use to obtain information, and the incentives and conditions that may compel them to manufacture evidence, is sufficiently beyond the common experience of jurors that expert opinion on the matter would be of assistance in evaluating the informants' testimony. [Citations.]" He also relies on *People v. Curl* (2009) 46 Cal.4th 339 (*Curl*) and *People v. Chacon* (1968) 69 Cal.2d 765 (*Chacon*) in his quarrel with the trial court's adverse ruling, and he relies on Evidence Code section 780, subdivision (f)[3] to assert he has an "absolute right" to explore a witness's bias. None of these contentions has merit.

The primary problem is Vega essentially ignores the standard of review applicable to claims of evidentiary error. Under well-established principles, the trial court has broad discretion in deciding whether to admit or exclude expert testimony (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196), and its decision as to whether expert testimony is admissible is subject to review under the abuse of discretion standard.

---

[2] At trial, Vega failed to object to the court's ruling on grounds it violated his constitutional rights. "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' [Citation.]" (*People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7.) Nevertheless, in addition to rejecting his claim of state evidentiary error, we find no merit in his constitutional claims.

[3] Evidence Code section 780 states, in pertinent part, "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following: [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive."

(*People v. Alcala* (1992) 4 Cal.4th 742, 788-789.)  Thus, to warrant reversal, Vega must establish the trial court ruled "'in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.  [Citation.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)  Vega cannot demonstrate an abuse of discretion warranting reversal here.

It is true that to be admissible, expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. McDowell* (2012) 54 Cal.4th 395, 425-426.)  However, the tenuous credibility of informants is not a matter sufficiently beyond common experience such that expert testimony must be admitted for the jury's understanding.  In fact, the trial court here gave two standard jury instructions specifically directed at this issue.  (CALCRIM Nos. 336, 337.)  Among other things, CALCRIM No. 336 specifically told the jury to view the testimony of an in-custody informant "with caution and close scrutiny," but that the mere fact a witness is in custody alone does not make the witness more or less believable.  Moreover, the court gave other instructions telling the jury how to judge the credibility of witnesses, which included CALCRIM No. 226, a standard instruction based on Evidence Code section 780.

The two cases cited by Vega do not compel a different conclusion.  In *Chacon*, one prison inmate, Smith, was stabbed by four other inmates during a fight. (*Chacon*, *supra*, 69 Cal.2d at p. 770.)  The prosecution called Smith as a witness, but he told the jury he started the fight and Chacon had not been involved.  He denied implicating the defendants when questioned by a correctional officer, and he said he had no fear of testifying against them.  (*Id.* at p. 779.)  The court permitted a correctional officer, Officer DeBord, to testify about a conversation he had with Smith about a month after the stabbing in which Smith never mentioned he had started the fight, told the officer all four inmates had stabbed him but declined to testify for the prosecution because he did not want to be an informer, and if called to testify would do so in favor of

12

the inmates.  (*Ibid.*)  The court also permitted the prosecution to call another correctional officer, Officer Weber, to testify about the "'convicts' code,'" which he "described as an unwritten rule that prison inmates be silent about prison disciplinary matters," and often resulted in prisoners refusing to make any statements implicating their fellow inmates. (*Ibid.*)

The California Supreme Court reversed the judgments as to both guilt and penalty phases because the trial court refused to provide separate counsel for each defendant.  (*Chacon*, *supra*, 69 Cal.2d at pp. 773-776.)  The court then went on to address other issues it believed could arise on retrial, including the admissibility of Smith, DeBord, and Weber's testimonies.  (*Id.* at pp. 779-780.)  The court found Smith's testimony admissible as proper impeachment of the prosecution's own witness (Evid. Code, § 785), and DeBord's testimony admissible as evidence of prior inconsistent statements (Evid. Code, § 780, subd. (h)) and as evidence of bias (Evid. Code, § 780, subd. (f)).  (*Chacon*, *supra,* 69 Cal.2d at p. 780.)

As for Weber's testimony, the high court stated, "Weber testified to conditions generally existing in prisons and their effect on the veracity of prisoners.  His testimony was relevant [citation], and was admissible to show circumstances affecting the bias of the witness.  [Citations.]  The trial court did not abuse its discretion in finding that Weber was qualified as an expert.  [Citations.]"  (*Chacon*, *supra*, 69 Cal.2d. at p. 780.)

The above-quoted passage from *Chacon* does support Vega's argument, but we question the precedential value of these musings about possible issues that might have arisen during a retrial in *Chacon*.  Certainly, the court's preventative observations do not equate to a rule requiring trial courts to admit expert witness testimony to prison conditions and the general veracity of prisoners whenever the prosecution calls an informant to testify about a defendant's incriminating statements.

Furthermore, Vega ignores the expansive and elastic limits of the abuse of discretion standard of review.  Under this standard, a trial court's ruling, even if it is

13

diametrically opposed to a ruling on the same issue in a different proceeding or court, will be accorded the same level of deferential scrutiny on appeal. In other words, the fact the California Supreme Court found the trial court's evidentiary ruling to be within its discretion in *Chacon* does not necessarily mean the opposite ruling here requires a reversal of the judgment.

The *Curl* case is equally unpersuasive. In *Curl,* the defendant's fellow inmate, David DeSoto, contacted the county prosecutor's office in an attempt to exchange a reinstatement of his bail for testimony about Curl's confession to a murder, his explanation of the motive for the murder, and details he gave about the crime. (*Curl*, *supra*, 46 Cal.4th at p. 347.) On appeal, Curl challenged DeSoto's testimony on grounds the prosecutor failed to produce notes he had made to memorialize his conversation with DeSoto and suborned perjury by calling him as a witness, and argued the trial court committed misconduct because it ruled the prosecutor's notes were not discoverable. (*Curl*, *supra*, 46 Cal.4th at pp. 352-357.)

In addition, Curl complained because the trial court denied his request to call a private investigator, as an "'expert to explain how an inmate informant can obtain information used to concoct a confession that was never made.'" (*Curl*, *supra*, 46 Cal.4th at p. 357.) Curl argued the investigator's testimony would have been relevant to explain how DeSoto could have manufactured Curl's confession by assembling information about him. (*Ibid.*) The trial court ruled the proffered testimony irrelevant, speculative, improper opinion about DeSoto's credibility, and invading the province of the jury. (*Ibid.*)

The California Supreme Court upheld the trial court's decision in *Curl* because such evidence was inadmissible on the issue of DeSoto's credibility, and "[t]o the extent the purpose of the testimony was to demonstrate how inmate informants confabulate testimony," the defendant failed to provide a sufficient foundation for admission in the absence of evidence DeSoto was a repeat inmate informant, or other

14

evidence contradicting his testimony that defendant was the sole source of his information. (*Curl*, *supra*, 46 Cal.4th at pp. 359-360.)

Here, unlike in *Curl*, neither expert could have provided evidence contradicting the informants' testimony that Vega's own statements were the sole source of their information. The informants steadfastly denied using his paperwork and the rumors of others to concoct incriminating statements. The experts had opinions about how such fabrication could be done, but there was no evidence these particular informants utilized those methods. Moreover, of the three, only Moriel might have qualified as a repeat inmate informant. He claimed to have informed on others and to have worked with federal authorities, but there was no evidence his purported work resulted in any benefit to him. Thus, Vega fails to adequately demonstrate Strong or Natapov's expert testimony would have assisted the jury in its determination of the informant's credibility. It follows the trial court did not abuse its discretion in excluding these witnesses under Evidence Code section 801.

Furthermore, the court properly weighed the probative value of the proffered testimony against the other factors pertinent to an Evidence Code section 352 analysis, namely that the experts' testimony was cumulative of other evidence, confusing, and improper. The court gave clear reasons for excluding the experts' testimony under Evidence Code section 352, and none of them constitute an abuse of discretion.

Finally, even assuming error, we conclude the error did not result in a miscarriage of justice. (Evid. Code, § 354.) Eyewitness testimony and circumstantial evidence linked Vega to the hit-up at the bus stop and the subsequent murder. He was arrested in a car very closely matching the description of the suspect vehicle with any differences explainable by the witnesses' failure of recollection, or some changes in the car during the time between the murder and Vega's arrest. There was quite a cache of guns and ammunition in the car, some of which matched the type and characteristics of the ammunition used to kill Giovani. Vega bragged that he killed what he thought was a

15

member of a rival gang, and the informants' testimony was markedly similar as to Vega's method and motivation for the crime, facts which did not come out through the testimony of investigating officers.  Vega attacks the credibility of the eyewitnesses because of discrepancies in the evidence and their recollection of a crime committed nearly seven years before the trial, but we must defer to the jury's credibility determinations if supported by substantial evidence.  (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  And, Vega's alibi evidence included the testimony of openly biased witnesses, namely family members.  Considering the strength of the prosecution evidence, Vega's rather tepid alibi defense, and defense counsel's thorough cross-examination of the eyewitnesses and informants, we are convinced any error was harmless under state evidentiary rules, and did not violate state and federal Constitutional guarantees to due process and the presentation of an adequate defense.

## DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

MOORE, ACTING P. J.

ARONSON, J.

16