Filed 1/7/15  P. v. Lyons CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COREY JOHN LYONS,<br><br>    Defendant and Appellant. | 2d Crim. No. B242306<br>(Super. Ct. No. 1296247)<br>(Santa Barbara County)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on December 9, 2014, be modified as follows:

1.  On page 2, line 2, the sentence "We affirm" is deleted, and the following sentence is inserted in its place:  "We modify the judgment to reflect 1,122 days of actual custody credit, but otherwise affirm."

2.  On the last page, under the heading "Disposition," the sentence "The judgment is affirmed" is deleted, and the following sentences are inserted in its place:  "We modify the judgment to reflect 1,122 days of actual custody credit, but otherwise affirm.  The trial court shall prepare an amended abstract of judgment reflecting 1,122 days of actual custody credit, and forward it to the Department of Corrections and Rehabilitation."

This modification changes the judgment.

Filed 12/9/14 (unmodified version)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>COREY JOHN LYONS,<br><br>    Defendant and Appellant. | 2d Crim. No. B242306<br>(Super. Ct. No. 1296247)<br>(Santa Barbara County) |

A jury found Corey John Lyons guilty, as charged, of the first-degree murders of Daniel Lyons and Barbara Scharton and burglary. (Pen. Code, §§ 187/189, 459.) The jury also found true special allegations that appellant intentionally committed multiple murders for financial gain by means of lying in wait (*id.*, § 190.2, subd. (a)(1)(3)(15)) and that he personally used a firearm which proximately caused Daniel's and Barbara's deaths (*id.*, § 12022.53, subd. (d)). On the murder convictions, the trial court sentenced appellant to two consecutive terms of life without the possibility of parole, plus two consecutive 25-year-to-life terms for the firearm enhancements (*id.*, subds. (b)-(e)). He appeals that judgment and contends the trial court erred by 1) admitting a videotaped conversation between him and his wife at the police station; 2) permitting his wife and his sister to testify; 3) admitting evidence of

gunshot residue (GSR) tests unrelated to this incident; and 5) other evidentiary rulings. We affirm.

## FACTS

### The Murders

On May 4, 2009, at about 1:30 a.m., neighbors heard sounds of gunshots and breaking glass from the direction of Daniel's and Barbara's' house, and called 911. Police and SWAT officers arrived within minutes and later that morning found Daniel's and Barbara's bodies inside the house. They were killed by shots fired from a handgun and shotgun. No spent shell casings were found at the scene. The house was not ransacked and nothing appeared to have been stolen. Officers went to appellant's house about 3:00 a.m. that night after receiving information from neighbors that there was a high level of conflict between appellant and Daniel.

Upon arrival at appellant's home, one of the officers telephoned the house and told appellant's wife Mildred that there had been a "ruckus" at Daniel's house and that they wanted to speak to appellant. Mildred looked for appellant but he was not at home. She let an officer look in the bedroom but he found only appellant's cell phone and money clip. Mildred led an officer to a motor home parked across the street, called for appellant but got no answer. Mildred unlocked the motor home and she and an officer looked inside. There was no evidence that appellant had been there recently. Officers inspected appellant's white pickup truck and found his wallet and a key ring. His BMW motorcycle was missing. Officers parked their patrol cars nearby to watch appellant's residence and the motor home, but they did not see anyone coming or going during the night.

Appellant called his sister Colleen Zitelli around 3:32 a.m. – two hours after the murders. His call was placed from the offices of Harwin Management – appellant's occasional employer. Appellant spoke to his sister for about nine and a half minutes. He told her, "It's over." And talked about his three-year-old daughter and asked his sister to look after his family and not to call him back. He said, "This is not a confession." Colleen called him back at 4:07 a.m. but got no answer.

2

At about 7:00 a.m., detectives arrived at appellant's home and searched his residence. Around 9:00 a.m., appellant stepped out of the motor home and detectives arrested him. They handcuffed him, put him in a patrol car and drove him to the police station where he was dressed in jail clothing. His hands were tested for GSR and particles of GSR were detected in concentrations that experts would later testify could only have been produced by discharging a firearm. Appellant was placed in an interview room.

When Mildred arrived at the police station, she did not know what had happened at Daniel's house or that appellant was involved in a shooting there. Officers interviewed her for about an hour and then escorted her to the room where appellant was being held. Their conversation was recorded and videotaped.

Appellant's BMW motorcycle was found at Harwin's the next day. His helmet, gloves, jacket and fanny pack were found inside Harwin's office with a note telling the owner the BMW would not start and that he would pick it up the next day. Harwin is close to appellant's motor home – about a five-minute walk by a route not visible to the officers parked on the street. GSR particles were found also on appellant's fanny pack, on one of his gloves and inside his truck.

*The Lawsuit*

Appellant was a contractor, Daniel was an insurance lawyer and Barbara, also an attorney, specialized in construction defect cases. Although, appellant and Daniel were not close and rarely spent time together, Daniel asked him to bid for a job to remodel Daniel's and Barbara's house. Appellant at first was reluctant to get involved in a business deal with Daniel. Mildred was opposed to it because she did not trust Daniel and Barbara. In spite of that, appellant agreed to manage the project on a time and materials basis.

Their agreement for the project required Daniel and Barbara to control the flow of money and to pay the workers' compensation insurance premiums. They instructed appellant to pay half of his payroll expense to the employees in cash to keep the payroll low because the premiums are based on a percentage of a contractor's

3

payroll. If payroll is under-reported, however, the employer is treated as unlicensed and is not entitled to payment for any work done on the project. Appellant complied with their instructions and paid the employees and suppliers in cash provided by Daniel and Barbara.

Daniel and Barbara moved into the house before completion of the project and soon began complaining about appellant's work. In October 2008 they sued appellant, his wife and their company Select Construction to recover damages for alleged work defects and $1 million that they paid to appellant for the project. This created significant tension between appellant and Mildred, damaged their marriage and threatened their financial well being. An attorney suggested that appellant and Mildred settle the lawsuit. With the help of a court-appointed mediator, they negotiated an agreement that would require them to pay Daniel and Barbara $100,000 from a new loan on their home; to convey an unimproved property to Daniel and Barbara; and to execute a five-year note for $150,000 at 10 percent interest. This would strip appellant and Mildred of all their assets and burden them with two notes that were likely impossible for them to pay. The date to finalize the agreement with counsel was May 4, 2009, the day of the murders.

Prior to the murders, Barbara told her sister she feared that appellant "might burn the house down in retaliation for the lawsuit." She also told a neighbor to call the police if he saw appellant around their home.

*Appellant's Statements to Others*

Months before the murders, appellant told his brothers Patrick and Tom about how angry he was with Daniel and that he was "going to hire a hit man" to kill him. Appellant also expressed intense anger and enmity toward Daniel to persons acquainted with him and Daniel. He asked a roofing contractor if he knew someone who "would take [Daniel] out." He told another acquaintance, "I just want him dead, I could just kill him." He told his sister and his brother Tom that he wanted to kill Daniel and would have already done so if it were not for his two children.

4

*Appellant's and Mildred's Conversation at the Police Station*

Appellant contends that he invoked his Fifth Amendment right to remain silent; that admitting the videotaped conversation between him and his wife violated that right; and that recording their conversation violated their statutory marital right to confidentially converse with one another when the circumstances make it reasonable for them to expect the conversation to be private. We are not persuaded.

We review the trial court's decision to admit the recorded conversation between appellant and his wife for an abuse of discretion. The standard of review for a ruling about whether a party has a reasonable expectation of privacy is whether substantial evidence supports the finding. (*People v. Mickey* (1991) 54 Cal.3d 612, 655.)

A justifiable expectation of privacy does not attach to conversations with a person in custody except when the communication is with counsel (*In re Jordan* (1972) 7 Cal.3d 930, 937-938, fn. 3) or when jail officers act in a way that the suspect "and his wife [are] lulled into believing that their conversation would be confidential." (*North v. Superior Court* (1972) 8 Cal.3d 301, 311 (*North*); see *People v. Loyd* (2002) 27 Cal.4th 997, 1010 ["Following the 1994 amendment to section 2600, California law . . . permits law enforcement officers to monitor and record unprivileged communications between inmates and their visitors to gather evidence of crime."].)

In *North*, the "conversation between [North] and his wife occurred in a detective's private office under circumstances which strongly indicated that [they] were lulled into believing their conversation would be confidential. Although the record does not disclose whether or not [the detective] made any representations to that effect, his admitted conduct spoke as clearly as words – first by surrendering to [them his] own private office so that [they] might converse and then by exiting and shutting the door, leaving them entirely alone. [N]othing in [the detective's] actions indicated that [North's] conversation would be monitored." (*North, supra,* 8 Cal.3d at p. 311.) The court said these facts "resort[ed] to the deliberate creation of a

5

situation in which marital privacy could reasonably be expected to exist" and were "a sufficient showing by [North] to establish a reasonable expectation of privacy." (*Id.*, at pp. 311-312).

*North* is factually distinguishable. Here, Mildred spoke with an investigator inside a comfortable, unlocked interview room before she was escorted to the locked and sparsely furnished room where appellant was being held. Mildred was searched and required to turn over her purse before they were left alone. She was not treated as if she were in custody. It was clear appellant was under arrest since he was dressed in an orange jail jumpsuit. The spouses did not behave as if they believed their conversation would be private, e.g., Mildred said, "I know you don't want to talk," and when she audibly contradicted his claim that he was in the motor home at 3:30 a.m., he "shushed" her. Much of their conversation was deliberately in whispers, inaudible and not captured by the recording device. Appellant contends their conduct demonstrates they wished and expected their conversation to be private. The trial court properly inferred it was also likely that they whispered because they knew someone might be listening. While the detective did not tell them that their meeting would be recorded, neither appellant nor Mildred could reasonably assume their conversation was and would remain private.

The audible portion of the conversation included nothing that was specifically incriminating. Nevertheless, the content of the conversation was relevant because appellant falsely told Mildred that he was asleep in the motor home at 3:00 a.m. when the police arrived at their residence, and shushed her when she said he was not in the motor home when she checked at about 3:30 a.m. Appellant later falsely stated he was in the bathroom when Mildred opened the door and called for him and claimed he did not answer her because it annoyed him when he thought she was checking up on him. All that was false and could reasonably be inferred to be an attempt to create a false alibi.

Evidence Code section 980 codifies the privilege of a spouse "to refuse to disclose, and to prevent another from disclosing, a communication if he claims the

6

privilege and the communication was made in confidence between him and the other spouse while they were husband and wife." But a person's communication with his or her spouse is in confidence only if the parties to the conversation intend nondisclosure and are entitled reasonably to expect their conversation would be private. (*People v. Mickey*, *supra*, 54 Cal.3d at p. 654; *North*, *supra*, 8 Cal.3d at p. 311.) Here, the circumstances surrounding appellant's and Mildred's interaction with police and their behavior during their recorded conversation substantially supports the trial court's conclusion that they did not reasonably expect that their conversation was or would be private. Admitting the recording of their mostly whispered conversation was not an unwarranted invasion of their marital privacy. (*People v. Santos* (1972) 26 Cal.App.3d 396, 402.)

*Compelling Appellant's Wife to Testify*

Mildred moved to quash the prosecution's subpoena compelling her to testify at appellant's trial. She argued that Evidence Code section 980 allows her to refuse to testify in criminal proceedings against her spouse and that the exception to the marital privilege for a crime committed against a relative (*id.*, § 972, subd. (e)(1)) should not be applied to "a crime that took place at a remote location against a relative who did not reside in their household." The trial court denied her motion.

Appellant contends the scope of the classification "relative" is so vast that the meaning of the word is not readily apparent and thus the court is permitted to consider extrinsic aids to determine what the Legislature meant. He points out the Legislature added "parent, relative, or cohabitant" to Evidence Code section 972 in 1986 as part of legislation dealing with domestic violence and abuse. He argues that this means that "[t]he relationship between [appellant] and the victim[s] must have some bearing on the marital relationship between [him] and his spouse for the marital exemption to apply." Appellant's argument is unconvincing.

"To ascertain the meaning of a statute, we begin with the language in which the statute is framed. If the statutory language is clear and unambiguous, the sole function of the court is to enforce the statute according to its terms. [Citations.]

7

'[W]here the principal problem of construction concerns the meaning of words used in the statute, we must look first to the words themselves [citation] and must interpret them 'according to the usual, ordinary import of the language employed in framing them.'" [Citations.]" (*People v. Siravo* (1993) 17 Cal.App.4th 555, 561 (*Siravo*).)

In *Siravo*, the defendant claimed that his wife could not be compelled to testify at his trial for a sexual assault against a commercial cotenant of his wife. He argued that 1) the exception to the marital privilege for "cohabitants" did not apply to the victim because she was a commercial cotenant, not a person with an intimate or significant "man-woman relationship" with his wife; and 2) because changing the reporting requirements for elder abuse in the bill meant the Legislature intended "cohabitants" to refer only to elderly or dependent persons who live in the same household. (*Siravo*, *supra*, 17 Cal.App.4th at pp. 561-562.) In dismissing Siravo's attempt to append unstated add-ons to the plain language of the statute the court stated, "It may be deduced from the Legislature's use of the word 'cohabit' (and its variants) and interpretive judicial decisions that cohabitation refers, simply, to people who live or dwell together." (*Ibid.*)

As applied to this case, appellant concedes the exception found in Evidence Code section 972, subdivision (e)(1) for relatives has a plain meaning and that Daniel is a "relative." In the absence of any indication that the Legislature intended the exception to apply only to relatives living in the same household, the rule of statutory construction regarding the plain or commonly used meaning of words contained in the statute is controlling.

*Appellant's Sister's Testimony*

In January 2011, appellant's sister Colleen Zitelli employed Tara Haaland-Ford to negotiate the terms of a "use immunity" agreement that enabled Zitelli to testify about appellant's telephone call to her at 3:32 a.m. on the day of the murders. Zitelli's testimony was expected to incriminate appellant.

A few minutes before appellant called Zitelli, he called and spoke to attorney Steve Balash, who represented him through the arrest and preliminary hearing

8

in July 2009. Appellant claimed that Haaland-Ford was a "legal partner" of Balash and that their business relationship disqualified her from representing Zitelli.

Appellant moved to prevent Zitelli from testifying based upon a conflict of interest. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.) After an evidentiary hearing, the court denied his motion and found that Balash and Haaland-Ford were not partners. Although they practiced in the same office space, shared certain advertising strategies and expenses, they had independent practices, did not have access to one another's files, and never shared any confidential client information. Appellant's attorney-client relationship with Balash was never compromised.

In reviewing an order denying a motion to disqualify counsel, we defer to the trial court's decision, absent an abuse of discretion. We are bound by the trial court's express or implied factual findings so long as those findings are supported by substantial evidence. We independently review the court's legal conclusions. (*In re Charlisse C.*, *supra*, 45 Cal.4th at p. 159.) Here, appellant was required to show that Haaland-Ford acquired confidential information from Balash or that it was reasonable to infer disclosure of confidential information because of the nature of the business relationship between Balash and Haaland-Ford.

It was not an abuse of discretion to deny the motion to prevent Zitelli from testifying. First, the trial court credited the testimony of Haaland-Ford and Balash that they were not partners and that their practices were separate within the same suite of offices. They did not share files or filing space and had separate phone lines, copy machines and bank accounts. Second, there was no evidence that Balash ever shared any confidential client information about appellant with Haaland-Ford or that she shared any information about Zitelli with Balash.

*Evidence of Gunshot Residue*

Appellant contends the trial court erred by allowing criminalist Steven Dowell to testify about GSR and to offer the opinion that microscopic particles of GSR found on appellant's person, fanny pack and motorcycle glove were the result of his use of a firearm and that they were not transferred there by interactions with police

9

officers, police cars or from the environment at the police station. This opinion was based in part upon Dowell's familiarity with GSR literature and nine studies by law enforcement agencies in major cities. In 2011, Dowell tested officers, police cars and furniture at the Santa Barbara City Police Department for GSR levels. The majority of the 788 samples in all 9 studies contained no particles characteristic of GSR and most of the samples that did contain such particles had 4 or fewer. Appellant had 20 particles characteristic of GSR on the back of one hand, 1 in his hair, 3 in his truck, 13 on in his fanny pack and 2 in his left motorcycle glove.

A claim that expert opinion was improperly admitted is reviewed on appeal for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 425-426; *People v. Catlin* (2001) 26 Cal.4th 81, 131.) A trial court has broad discretion to limit or exclude expert testimony. (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.) An expert may base his opinion on "matter . . . whether or not admissible that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates[.]" (Evid. Code, § 801, subd. (b).) "Expert opinion testimony is admissible only if it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'" (*People v. Watson* (2008) 43 Cal.4th 652, 692.) "'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates[.]'" (*Ibid.*)

The nine studies Dowell referenced to support his opinion that the GSR particles on appellant's hands came from use of a firearm were not shown to be unreliable. The court properly allowed Dowell to provide jurors with a frame of reference to judge the significance of the quantity of GSR particles found on appellant's person and to test the arguments appellant advanced to diminish the significance of the presence of GSR on his hands and belongings. The court instructed the jury that Dowell's test results could not be considered as determinative of the levels

10

of GSR on police officers, in their cars or in the interview rooms at the police station in 2009 when appellant was arrested.

Even if the trial court committed error in admitting Dowell's opinion, the error is harmless. The evidence was not so inflammatory as to implicate constitutional protections. Instead, the proper standard of review for the erroneous admission of expert testimony is whether it is reasonably probable appellant would have received a more favorable result in the absence of the error. (*People v. Prieto* (2003) 30 Cal.4th 226, 247; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Evidence of appellant's guilt was extensive and convincing. He freely expressed his hatred of Daniel and Barbara to his family and others and of his wish to kill Daniel. He made incriminating statements to his sister at 3:32 a.m. – only two hours after the murders. He acknowledges the GSR particles found on him and his belongings were strong evidence of his guilt. Even without Dowell's opinion that the GSR found on appellant and his gear came from guns he fired, other evidence shows it is exceedingly unlikely GSR would have been present on police officers or their equipment in sufficient quantities to explain the quantity of GSR on appellant. There is no reasonable probability appellant would have obtained a more favorable result if Dowell's opinion had been excluded.

### Other Evidentiary Rulings

Other trial court's rulings limited appellant's presentation of evidence about the merits of Daniel's and Barbara's lawsuit against him and his wife. The court also circumscribed evidence about neighbors and others who may have disliked Daniel and/or Barbara. These limits did not abridge appellant's rights to due process and a fair trial under the Sixth and Fourteenth Amendments.

Common sense limits on speculation about third-party culpability is not an arbitrary or disproportionate abridgment of a defendant's right to due process. (See *People v. Abilez* (2007) 41 Cal.4th 472, 517; *Robinson* (2005) 37 Cal.4th 592, 625; *People v. Sandoval* (1992) 4 Cal.4th 155, 176 [Although "defense identified two persons with plausible motives, they had no direct or circumstantial evidence linking

11

them to actual perpetration of the crimes"]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1017-1018.)

"While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326.)

### *The Third Trial*

Appellant's first two trials ended in mistrials. The first trial ended when the court was required to grant a mistrial when appellant's brother Tom unexpectedly testified that the whole family believed appellant killed Daniel and Barbara. In the second trial, the court declared a mistrial when the jurors declared that they were hopelessly deadlocked seven to five in appellant's favor.

Appellant complains that it was an abuse of the court's discretion to allow prosecutors to try the case a third time. He contends his constitutional rights to due process and a fair trial were violated because the prosecution "learned the defense strategy" during the first two trials and was better able to meet his defenses. We disagree. Appellant's argument proceeds from the false premise that the People were somehow responsible for the mistrials. The prosecutor did not deliberately invite the statement volunteered by appellant's brother and had nothing to do with the jury's inability to reach a verdict in the second trial.

There is "'manifest necessity'" to order a retrial when the jury declares it is unable to reach a verdict. (*People v. Batts* (2003) 30 Cal.4th 660, 679; *Oregon v. Kennedy* (1982) 456 U.S. 667, 672; see also *Arizona v. Washington* (1978) 434 U.S. 497, 509.) In *Batts*, the California Supreme Court said a double jeopardy finding may be warranted when a prosecutor, "believing in view of events that unfold during an ongoing trial that the defendant is likely to secure an acquittal at that trial in the absence of misconduct, intentionally and knowingly commits misconduct in order to

12

thwart such an acquittal – and a court, reviewing the circumstances as of the time of the misconduct, determines that from an objective perspective, the prosecutor's misconduct in fact deprived the defendant of a reasonable prospect of an acquittal. [Citations.]" (*People v. Batts*, *supra*, 30 Cal.4th at p. 695.) Here, the first mistrial was declared in response to appellant's motion with a finding of no misconduct. The second trial was declared upon the jury's deadlock – "long considered the classic basis for a proper mistrial." (*Arizona v. Washington*, *supra*, 434 U.S. at p. 509.)

We have considered appellant's other arguments and conclude that none of them warrant further discussion.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


BURKE, J.*


We concur:



GILBERT, P. J.



PERREN, J.

_____

* (Judge of the Superior Court of San Luis Obispo County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.)

13

Brian E. Hill, Judge

Superior Court County of Santa Barbara
_____


Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Louis W. Karlin, Deputy Attorney General, for Plaintiff and Respondent.