Filed 4/25/13  P. v. Musser CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GARREN VANCE MUSSER,<br><br>    Defendant and Appellant. | 2d Crim. No. B233567<br>(Super. Ct. No. 1291346)<br>(Santa Barbara County) |

Garren Vance Musser appeals the judgment following his conviction for first degree murder.  (Pen. Code, §§ 187, subd. (a)/189.)[1]  The jury found to be true a special circumstance allegation that the murder was committed while lying in wait (§ 190.2, subd. (a)(15)) and an allegation that Musser personally used a deadly weapon (§ 12022, subd. (b)(1)).  Musser was sentenced to life without possibility of parole, plus a consecutive one-year term for the weapon enhancement.  He contends that the trial court erred by limiting expert testimony, that the prosecutor committed misconduct, and that there was insufficient evidence to support the lying in wait special circumstance.  He also claims that California's death penalty statute is unconstitutional and that his sentence constituted cruel and unusual punishment.  We affirm.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

FACTS AND PROCEDURAL HISTORY

On October 3, 2008, Musser met victim Lisa Zazueta in a bar. Musser and Zazueta spent the night together at Zazueta's home and had sexual intercourse. During the following two weeks, Zazueta sent several text messages to Musser seeking to continue their relationship and expressing romantic feelings towards him. Having learned that Zazueta was married, Musser responded to her text messages by stating that he did not want to talk to her, did not want her texting him, and did not want to see her. In one text message, Zazueta told Musser she might have gotten pregnant during the night they spent together. Musser suggested an abortion if she in fact was pregnant. Zazueta continued sending text messages attempting to get together with Musser.

On October 18, Zazueta text messaged Musser stating that she wanted to come to his house that night and have sex with him one more time. After more text messages from her, Musser agreed to see Zazueta again, hoping that she would leave him alone after that. They went to a motel where they had sex.

On October 19, Zazueta texted Musser stating that she wanted to have sex with him again. Musser responded that he never wanted to see her again. On October 20, Zazueta texted that she was not pregnant but missed him. On October 21, Zazueta telephoned Musser, again trying to get together with him. Musser said no. Text messages from Zazueta followed later the same day asking for sex and telling Musser that he had broken her heart. Musser again responded by telling her to leave him alone. On October 22, there were no Zazueta text messages except a message intended for another person which was mistakenly sent to him. Musser responded to the misdirected message and Zazueta responded by stating that she was, in fact, pregnant and would not get an abortion. Musser was very upset.

At 10:00 p.m. on the evening of October 22, Zazueta telephoned Musser and they talked for 17 minutes. She told him she loved him and was coming over to his house that night to have sex. He told her not to come over and that he never wanted to see her again. Zazueta persisted in stating that she was coming to his house. After the telephone call, Musser decided that, if she came to his house, he would kill her.

2

Zazueta came to Musser's house shortly after midnight on October 23. She had texted him that she was on her way. Musser dressed and got a "Smith and Wesson Home Security" knife from a drawer. He planned to use the knife to kill her. Zazueta arrived at 12:19 a.m. and Musser went outside. Zazueta walked up to him. He told her to leave, but she refused and they talked for a few minutes. Zazueta would not leave.

Musser pulled out his knife, opened it and held it at his side for approximately two minutes while he stroked Zazueta's face and she kissed his hand. Then, Musser cut Zazueta horizontally across her throat with his knife killing her. The single wound severed her carotid artery, both jugular veins, and her trachea. Her head was held to her body only by some muscle tissue and the spinal cord.

Musser retrieved Zazueta's cell phone which would tie her to him, went into his house, washed, and changed clothes. He threw his bloody clothes in a trash can. He then called 911 and reported that there was a dead body lying outside his house.

When police arrived, Musser told them he did not know Zazueta and just found her lying in front of his house. After finding Musser's bloody clothes, the knife and other incriminating evidence at the scene, the police detained Musser and brought him to the police station. At the police station, Musser quickly confessed to the police and his family that he had killed Zazueta. His taped confession to the police was played to the jury during trial.

## DISCUSSION

### *No Error in Limitation on Expert Testimony*

Musser contends the trial court erred by limiting testimony from an expert witness on stalking and the reactions of stalking victims. Musser's principal defense was that he killed in a heat of passion provoked by Zazueta's stalking of him and, therefore, he was guilty only of voluntary manslaughter. He argues that limitations on testimony from his expert deprived him of his constitutional right to present a defense. (See *Davis v. Alaska* (1974) 415 U.S. 308, 315; *Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) We disagree.

3

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); *People v. Watson* (2008) 43 Cal.4th 652, 692.) Expert testimony is inadmissible when it consists of inferences and conclusions which can be drawn as easily and intelligently by the jury as by the witness. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506; see *People v. Lowe* (2012) 211 Cal.App.4th 678, 684.) Accordingly, a trial court has broad discretion to limit or exclude expert testimony. (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196.) We review a trial court's ruling under the abuse of discretion standard. (*People v. McDowell* (2012) 54 Cal.4th 395, 425–426.) Application of ordinary rules of evidence does not infringe upon a defendant's right to present a defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 427-428.)

Musser offered expert testimony regarding stalking from psychologist Mindy Mechanic. At an Evidence Code section 402 hearing, Dr. Mechanic informed the court that she had adopted a very broad definition of stalking as a pattern of intrusive and unwanted contacts that are likely to cause distress or fear in the victim. She stated that under her definition, in contrast to the legal definition, stalking does not require violence or threats or that the stalking victim fear for his or her safety.[2] Dr. Mechanic stated that causing distress or anger in the victim was sufficient to label behavior as stalking, and that victims may react with paranoia, confusion or aggression and may suffer depression and post traumatic stress symptoms. She explained that certain stalking behavior appears "innocuous" or "benign" on the surface. In such cases, male victims often believe they can handle the situation, and are less likely than women to report stalking to the police or

---

[2] Under section 646.9, subdivision (a), stalking is defined as: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by . . . imprisonment in the state prison."

seek restraining orders. Dr. Mechanic never interviewed Musser but, based on her review of court documents, stated that she was prepared to testify that Zazueta had been stalking Musser during the three weeks before her death.

The court ruled that much of Dr. Mechanic's anticipated testimony was inadmissible at trial because it was not sufficiently beyond common experience to assist the jury, and inferences and conclusions regarding stalking and the reaction of its victims could be drawn as intelligently by the jurors without her testimony. (See *People v. Valdez, supra,* 58 Cal.App.4th at p. 506; Evid. Code, § 801, subd. (a).) Specifically, the trial court ruled that Dr. Mechanic could not opine that Zazueta was stalking Musser or that stalking caused trauma in its victims. For the same reason the court excluded testimony regarding the possible reactions of stalking victims such as paranoia, confusion, aggression, depression, post traumatic stress, and thoughts of suicide.

The trial court, however, allowed testimony regarding the reluctance of stalking victims, especially men, to involve the police or the courts. At trial, Dr. Mechanic testified regarding her broad definition of stalking as a "pattern of recurring unwanted intrusion and communications that result in the victim feeling distress or fear." She testified that stalking could involve seemingly benign behavior such as telephone calls, stopping at a house, leaving notes, and sending gifts. She also testified that men believe they can handle stalking especially when the stalker is not a stranger, and are less likely to report stalking to the police than women.

We conclude that the trial court did not abuse its discretion. As stated in an analogous case, expert testimony on the adequacy of provocation is not a subject sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (*People v. Czahara* (1988) 203 Cal.App.3d 1468, 1477-1478.) The "reasonableness of a reaction is left to the jurors precisely so that they may bring their common experience and their own values to bear on the question of whether the provocation partially excused the violence." Experts "may have specialized empirical knowledge regarding the range of reactions to a given provocation, or the reaction of the statistically average individual in a given community. But this information would not

5

materially assist the jury in its task; the jury must determine not only if the reaction is ordinary but if it is reasonable, and that determination depends more on (perhaps unarticulated) community norms than on empirically discoverable averages." (*Id.* at p. 1478.)

Moreover, Musser had ample opportunity to present expert testimony in support of his heat of passion defense. The exclusion of certain testimony did not prevent Musser from making the point that stalking does not require the victim to fear for his or her safety, and that stalking often includes seemingly benign behavior.

*No Prejudicial Prosecutorial Misconduct*

Musser contends that the trial court erred in denying a motion for new trial based on prosecutorial misconduct during argument. He argues that the prosecutor misstated the law regarding the provocation necessary to reduce murder to voluntary manslaughter by arguing that the standard is whether a defendant's response to the provocation was reasonable, rather than whether the provocation was sufficient to cause an ordinary person to act rashly. We conclude that there was no prejudicial error.

A prosecutor has wide latitude to draw inferences from the evidence but it is misconduct for the prosecutor to misstate the law. (*People v. Hill* (1998) 17 Cal.4th 800, 829-830, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Under California law, misconduct involves the use of deceptive or reprehensible methods to persuade the court or jury, but requires reversal of a conviction only if it is reasonably probable the result would have been more favorable to the defendant without the misconduct. (*People v. Cole* (2004) 33 Cal.4th 1158; see also *People v. Cook* (2006) 39 Cal.4th 566, 606, 608.) Under federal law, misconduct requires reversal only when it "infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) We evaluate the prosecutor's challenged statements in the context of the argument as a whole, and will not "lightly infer" that the jury interpreted the statements in their most damaging light. (*People v. Brown* (2003) 31 Cal.4th 518, 553–554; *People v. Dennis* (1998) 17 Cal.4th 468, 522.)

6

Here, the claimed misconduct involves the prosecutor's argument regarding a killing committed in the heat of passion. Malice is negated and a defendant commits voluntary manslaughter, not murder, when he or she unlawfully kills another person "upon a sudden quarrel or heat of passion." (§ 192, subd. (a); see *People v. Breverman* (1998) 19 Cal.4th 142, 153–154.) Heat of passion has both an objective and a subjective component. The defendant must kill while actually in the heat of passion, but the provocation must be sufficient to arouse passion in an "ordinarily reasonable person." (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253.) The killer's reason must be obscured as the result of a strong passion aroused by provocation sufficient to cause "a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.)

Musser relies on *People v. Najera* (2006) 138 Cal.App.4th 212 in which the prosecutor informed the jury on two occasions that a determination of heat of passion is based on the defendant's conduct in response to the provocation rather than whether the provocation itself would cause an ordinary person to act rashly. The prosecutor argued that the offense would be voluntary manslaughter only if "a reasonable person [would] do what the defendant did." (*Id.* at p. 223, italics omitted.) The Court of Appeal concluded that the prosecutor's statements misstated the law. "How the killer responded to the provocation and the reasonableness of the response is not relevant . . . ." (*Id.* at p. 223.) The focus is on whether the provocation was sufficient to cause a reasonable person to act rashly, not the reasonableness of the specific reaction. (*Ibid*.)

In the instant case, the prosecutor told the jury that the test was "whether or not a person of average disposition would do the same thing in the same or similar circumstance as the defendant did. . . . So ask yourself would a reasonable person do what the defendant did in his circumstance." The trial court sustained a defense objection to this statement. Restating part of her previous statement, the prosecutor then stated to the jury, "[w]ould a reasonable person do what the defendant did in the same or similar circumstance." The trial court again sustained a defense objection. The prosecutor then stated, "Did the defendant respond as a reasonable person did? And that is absurd that a

reasonable person or a person of average disposition would respond the way the defendant did in this case."  This time, the court overruled a defense objection, but admonished the jury "to the extent that they hear instructions on the law that are not consistent with what the Court has instructed, it's the Court's instructions that count."  During rebuttal argument, the prosecutor stated that "no person . . . of average disposition would have done what the defendant did in this case."  The court sustained a defense objection to this statement, again admonishing the jury that to the extent any argument by counsel misstates the law, the jury must follow the court's instructions.

We agree that the challenged comments by the prosecutor mixed correct and incorrect statements of law which could have at least confused the jury.  In substance, the statements incorrectly told the jury that it should consider whether the circumstances would have provoked a reasonable person to kill rather than whether the circumstances would have provoked a reasonable person "to act rashly and without due deliberation, that is, from passion rather than from judgment."  (CALCRIM No. 570.)

In any event, even if the prosecutor misstated the law regarding heat of passion, the error was harmless under any standard.  First, the trial court sustained all but one of the defense objections, and twice admonished the jury to follow its instructions rather than any inconsistent statements by the prosecutor.  In addition, the jury instruction given by the trial court correctly set forth the applicable legal principle.[3]  The rulings on

---

[3] The trial court instructed the jury with CALCRIM No. 570 in relevant part as follows:  "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
   The defendant killed someone because of a sudden quarrel or in the heat of passion if:
   1 The defendant was provoked;
   2 As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;
   AND
   3 The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.
   Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
   In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote

8

the objections combined with the admonitions were sufficient to cure any prejudice to Musser from the erroneous statements by the prosecutor. We presume the jury understood and considered all of the instructions. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320-1321; *People v. Najera, supra,* 138 Cal.App.4th at p. 224.)

### *Substantial Evidence Supports Lying in Wait Special Circumstance*

Musser contends there was insufficient evidence to support a finding that the murder was committed while Musser was lying in wait. We disagree.

In reviewing the sufficiency of the evidence, we review the entire record in the light most favorable to the prosecution "to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Silva* (2001) 25 Cal.4th 345, 368.) We do not resolve credibility issues or evidentiary conflicts, and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.) A reversal is unwarranted unless there is no substantial evidence to support the finding under any hypothesis whatever. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

The lying in wait special circumstance requires an intentional murder, committed under circumstances where there is a concealment of purpose, a substantial period of watching and waiting for an opportune time to act, and a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Combs* (2004) 34 Cal.4th 821, 853.) "'The element of concealment is satisfied by a showing "'that a defendant's true intent and purpose were concealed by his actions or conduct. . . .'"'" The defendant need not be literally concealed from view. (*Ibid.*) The period of watching and waiting need not continue for any particular amount of time, provided it is sufficient to show a

provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. . . ."

state of mind equivalent to deliberation or premeditation. (*Ibid.*) There must be a form of concealment of purpose, watchful waiting, and a killing during the same time period without a material interruption or change in purpose. (See *People v. Lewis* (2008) 43 Cal.4th 415, 512.)

Here, the evidence established that Musser concealed his intent and purpose to kill Zazueta. He rebuffed her advances but never took any action by word or deed which indicated any threat of physical harm. On the night of the murder, Musser did not lure her to his home in the common sense of the word, but took no action to prevent Zazueta from coming and knew she was coming with the hope they would talk and that he would return her affection for him. When Zazueta arrived at his home, Musser initially acted calmly and without antagonism. He did not demand that she leave or threaten to call the police or harm her. Instead, he had the murder weapon on his person and had decided to use it to kill her.

Also, evidence showed that defendant engaged in a substantial period of watching and waiting for an opportune time to act. "Watchful" does not require actual watching; it can include being "alert and vigilant" in anticipation of the victim's arrival to take him or her by surprise. (*People v. Sims* (1993) 5 Cal.4th 405, 433.) The record shows that he was waiting for her for a substantial period of time and was on the lookout for her arrival. Evidence also shows that, after the period of watching and waiting, Musser launched an attack on the unsuspecting Zazueta from a position of advantage.

Musser briefly notes that there was a period of several minutes after Zazueta's arrival and the stabbing during which he caressed her and tried to convince her to leave him alone. Such a period existed but does not undermine the evidentiary support for the special circumstance. Before 2000, section 190.2, subdivision (a)(15) required a killing "while" the defendant was lying in wait, and case law interpreted the word "while" to require a "temporal relationship" between the killing and the lying in wait without any cognizable interruption. (See *People v. Lewis, supra,* 43 Cal.4th at pp. 511-515.) In 2000, the language of special circumstance was amended to substitute "by means of" lying in wait for "while" lying in wait. (*People v. Superior Court (Bradway)* (2003) 105

Cal.App.4th 297, 307–308.) That change reduced the need for a temporal connection between the concealment and the killing. (*Ibid.*) Lying in wait does not require the killing to occur at the first available opportunity and permits the defendant to maximize his advantage prior to striking. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 501.)

### *Death Penalty Constitutional*

Musser contends that the California death penalty law violates the Eighth Amendment of the United States Constitution. He argues that the proliferation of special circumstances permit imposition of the death penalty in the overwhelming majority of first degree murder cases so as to eliminate the required "objective basis for distinguishing a case in which the death penalty has been imposed from the many cases in which it has not." (*People v. Crittenden* (1994) 9 Cal.4th 83, 154.) We disagree.

As respondent argues, because a death sentence was neither sought nor imposed, Musser lacks standing to challenge the constitutionality of the death penalty. (See *In re Cregler* (1961) 56 Cal.2d 308, 313.) Even if Musser had standing, however, his argument lacks merit.

Section 190.2, subdivision (a) provides that the penalty for first degree murder is death or life imprisonment without the possibility of parole if one or more of certain special circumstances have been found. Here, the jury found Musser guilty of murdering Zazueta while lying in wait. (§ 190.2, subd. (a)(15).) The prosecution, however, did not seek the death penalty and Musser was sentenced to life without the possibility of parole.

### *Sentence Not Cruel or Unusual Punishment*

As a separate constitutional claim, Musser contends that his sentence of life without the possibility of parole constitutes cruel and unusual punishment because it was grossly disproportionate to his crime. We disagree.

Musser has forfeited this claim because he failed to raise this contention in the trial court. (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.) We also reject the claim on its merits.

11

A sentence violates the state prohibition against cruel and unusual punishment (Cal. Const., art. I, § 17) if it is so disproportionate to the crime for which it is inflicted that it "shocks the conscience." (*People v. Dillon* (1983) 34 Cal.3d 441, 478; see also *Ewing v. California* (2003) 538 U.S. 11, 30; *In re Lynch* (1972) 8 Cal.3d 410, 424.) The federal standard is similar. (*Gregg v. Georgia* (1976) 428 U.S. 153, 173; *Harmelin v. Michigan* (1991) 501 U.S. 957.) In evaluating proportionality, courts consider the nature of the offense and the offender, punishments for more serious offenses in the same jurisdiction, and punishment for the same crime in other jurisdictions. (*Solem v. Helm* (1983) 463 U.S. 277, 288, 290–292; *In re Lynch,* at pp. 425–427.)

The crux of Musser's argument is that he committed only voluntary manslaughter and that his sentence was grossly disproportionate to that crime. He repeats his arguments that there was insufficient evidence to support the lying in wait special circumstance and ample evidence to support his heat of passion defense. The jury rejected these claims as have we. In addition, Musser admitted that he planned the extremely brutal murder. And, Musser makes no attempt to present an intrastate comparison of sentences for other crimes or an interstate comparison of sentences for the same crime. His argument fails on this basis alone.

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.

We concur:


GILBERT, P. J.


YEGAN, J.

12

Jean Dandona, Judge

Superior Court County of Santa Barbara

_____


Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.